T.C. Memo. 1995-526


UNITED STATES TAX COURT


JOSEPH E. MACHADO, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

ROBERT R. MACHADO AND KERRY S. MACHADO, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 17664-92, 17665-92.    Filed November 7, 1995.


Joseph E. Machado and Robert R. Machado, pro sese.

Maria D. Murphy, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

SWIFT, Judge:  Respondent determined deficiencies in and additions to petitioners' 1988 Federal income taxes as follows:

Joseph E. Machado

| | | Additions to Tax | | |
|---|---|---|---|---|
| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6653(a)(1) | Sec. 6661 |
| 1988 | $19,687 | $4,441 | $1,133 | $4,922 |

Robert R. and Kerry S. Machado

| | | Additions to Tax | | |
|---|---|---|---|---|
| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6653(a)(1) | Sec. 6661 |
| 1988 | $19,576 | $3,889 | $1,422 | $4,894 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for 1988, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After settlement, the primary issues for decision in these consolidated cases are whether petitioners Joseph E. Machado and Robert R. Machado bred and raced horses for profit and whether losses petitioners Joseph E. Machado and Robert R. Machado realized from partnership investments are limited by the passive activity loss provision of section 469.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. At the time the petitions were filed, petitioners Joseph E., Robert R., and Kerry S. Machado resided in Long Beach, California. Hereinafter, references to petitioners will be to petitioners Joseph and Robert Machado.

From 1979 until 1990, petitioners owned and operated Machado Trucking, Inc. (Machado Trucking), a trucking company that transported cargo throughout California. Petitioners each owned 50 percent of the outstanding shares of stock in Machado Trucking.

## 1980-84

In 1980, petitioners began, as informal partners, to purchase, breed, and race horses. Prior thereto, petitioners had little involvement with or experience in breeding and racing horses. Joseph became interested in breeding and racing horses through gambling on horses, and Robert became interested in breeding and racing horses through a college horseback riding class and through part-time employment for a horse trainer.

With respect to their horse breeding activity, petitioners' initial stated intention was to purchase broodmares, to breed the broodmares with stallions owned by others, and then to sell the foals as potential racehorses.

With respect to their horse racing activity, petitioners' initial stated intention was to purchase experienced racehorses and to race the horses throughout California.

Petitioners treated their horse breeding and their horse racing activities as two separate activities. When petitioners began their horse breeding and horse racing activities,

petitioners did not consult experts regarding the business and economic aspects of horse breeding and horse racing.

During 1980 through 1984, petitioners purchased 5 broodmares, 16 racehorses, and a share interest in 2 stallions. Prior to purchasing a horse, petitioners researched the horse's lineage and success as a racehorse, and petitioners talked to various trainers and breeding agents. Prior to breeding their broodmares with stallions, petitioners researched the stallions' lineage and racing history.

Petitioners read books and periodicals pertaining to the techniques of horse breeding and horse racing.

Generally, petitioners shared equally the ownership interest in each of the broodmares, racehorses, and stallions, and they shared equally the expenses and income associated with their horse breeding and horse racing activities.

Petitioners did not own facilities in which to stable their horses. Petitioners' broodmares and the two stallions in which they purchased a share interest were stabled at commercial stables in Kentucky, Maryland, and Florida. Petitioners' racehorses were stabled at commercial stables in California.

The operators of the commercial stables were responsible for the general care and maintenance of petitioners' horses and for supervision of the breeding of petitioners' broodmares. Trainers were hired for the training of petitioners' experienced racehorses.

Petitioners spent only a few hours a day 3 or 4 days a week working on their horse breeding and horse racing activities. Petitioners would talk to trainers regarding their racehorses, determine in which races their horses would run, select the stallions with which to breed their broodmares, and arrange for veterinary care for their horses.

For 1980 through 1984, the record does not indicate how many foals were produced in petitioners' horse breeding activity. In 1982 and 1984, petitioners spent approximately $630 and $380, respectively, in advertising for sale foals that their broodmares had produced. Petitioners did not advertise the sale of their horses in any other year.

From 1980 through 1984, petitioners did not sell any foals produced from their broodmares, and petitioners realized no income from their horse breeding activity.

With respect to the horse racing activity, from 1980 through 1984, petitioners' horses ran in 118 races in California, and petitioners' horses placed first in 19 of the races. The record does not indicate the number of times petitioners' horses placed second or third.

From 1980 through 1984, petitioners won total prize money from their horse racing activity of approximately $133,542, but, after expenses, petitioners realized total combined net losses from their horse breeding and horse racing activities of approximately $613,538.

1985-90

By 1985, the racehorses that petitioners had purchased in prior years and that petitioners still owned were too old to race.  To reduce expenses and stud fees, petitioners began to breed their broodmares only with the older racehorses that petitioners already owned.  Petitioners purchased no additional racehorses, and petitioners moved their broodmares to California, where their racehorses were then stabled.  Thereafter, petitioners intended to obtain racehorses only from the offspring of broodmares and racehorses that they owned.

From 1985 through 1988, petitioners did not attempt to sell any of their broodmares or racehorses through advertising or auctions.

From 1985 through 1988, petitioners' broodmares produced 11 horses that petitioners trained and raced.  From 1985 through 1988, these 11 horses ran in 35 races.  The record does not indicate the number of races petitioners' horses won, nor how the horses placed.

Petitioners maintained information relating to their horse breeding and horse racing activities on a calendar.

During 1985 through 1988, petitioners realized no income from their horse breeding activity, and they realized total prize money of $7,316 from their horse racing activity.

In spite of the above changes to the manner in which petitioners operated their horse breeding and horse racing

activities, petitioners continued to realize substantial losses from both activities. During 1985 through 1988, petitioners realized combined net losses of $518,277 from their horse breeding and horse racing activities.

In 1989, petitioners determined that they were no longer able to continue their horse breeding and horse racing activities. In 1989, petitioners attempted to sell four of their racehorses in a horse auction in California. Three of petitioners' horses were sold at a price of $200 to $400 each. After 1989, Joseph was no longer involved in the horse breeding and horse racing activities.

In 1990, Robert sold or gave away the remainder of the horses and terminated the horse breeding and horse racing activities.

During 1980 through 1990, petitioners continued to work full time at Machado Trucking. In 1990, at the time petitioners' horse breeding and horse racing activities were terminated, Machado Trucking became unprofitable and went out of business.

Petitioners recorded their expenses with respect to their horse breeding and horse racing activities on a handwritten ledger and in a computer database that was also used by Machado Trucking. Checks, check stubs, and receipts relating to petitioners' expenses with respect to their horse breeding and horse racing activities were commingled and did not reflect

whether the expenses related to petitioners' horse breeding activity or to petitioners' horse racing activity.

The schedule below sets forth, for each of the years 1980 through 1988, combined net income, expenses, and losses of petitioners' horse breeding and horse racing activities, as reflected by petitioners on their individual Federal income tax returns:

| Year | Income | Expenses | Losses |
|------|--------|----------|--------|
| 1980 | $ -0- | $ 37,474 | $ 37,474 |
| 1981 | 17,566 | 63,034 | 45,468 |
| 1982 | 43,050 | 202,386 | 159,336 |
| 1983 | 48,820 | 263,952 | 215,132 |
| 1984 | 24,106 | 180,234 | 156,128 |
| 1985 | 2,250 | 175,314 | 173,064 |
| 1986 | -0- | 133,140 | 133,140 |
| 1987 | 934 | 106,998 | 106,064 |
| 1988 | 4,132 | 110,141 | 106,009 |
| Total | $140,858 | $1,272,673 | $1,131,815 |

The schedule below reflects for 1980 through 1989, where indicated in the record, Joseph's income from sources other than horse breeding and horse racing activities and Joseph's share of the above losses of petitioners' horse breeding and horse racing activities as reflected on Joseph's individual Federal income tax returns:

| Year | Joseph's Other Income | Joseph's Share of the Losses From Horse Breeding and Horse Racing |
|------|------|------|
| 1980 | $ -- | $ 18,737 |
| 1981 | -- | 22,734 |
| 1982 | -- | 79,668 |
| 1983 | -- | 107,566 |
| 1984 | -- | 78,064 |
| 1985 | 96,655 | 87,336 |
| 1986 | 87,386 | 68,671 |
| 1987 | 68,943 | 52,875 |
| 1988 | 99,799 | 52,879 |
| 1989 | -- | -- |
| Total | $352,783 | $568,530 |

The schedule below summarizes for 1980 through 1990 Robert and Kerry's joint income from sources other than horse breeding and horse racing activities and Robert's share of the income, expenses, and losses with respect to petitioners' horse breeding and horse racing activities, as reflected on Robert and Kerry's joint Federal income tax returns:

| Year | Robert & Kerry's Other Income | Robert's Share of Income From Horse Breeding and Horse Racing | | |
|------|------|------|------|------|
| | | Income | Expenses | Losses |
| 1980 | $ 64,171 | $ -0- | $ 18,737 | $ 18,737 |
| 1981 | 72,650 | 8,783 | 31,517 | 22,734 |
| 1982 | 123,654 | 21,525 | 101,193 | 79,668 |
| 1983 | 138,220 | 24,410 | 131,976 | 107,566 |
| 1984 | 115,428 | 12,053 | 90,117 | 78,064 |
| 1985 | 90,036 | 1,125 | 86,853 | 85,728 |
| 1986 | 96,673 | -0- | 64,469 | 64,469 |
| 1987 | 86,127 | 467 | 53,656 | 53,189 |
| 1988 | 150,000 | 2,066 | 55,196 | 53,130 |
| 1989* | -- | -- | -- | -- |
| 1990 | 56,000 | 8,664 | 23,834 | 15,170 |
| Total | $992,959 | $79,093 | $657,548 | $578,455 |

* With respect to 1989, the record does not indicate any information regarding Robert's share of the income or losses from petitioners' horse breeding and horse racing activities nor his income from other sources.

LB Partnership

In 1983, petitioners and four other individuals formed a partnership (the LB Partnership) to purchase a broodmare named La Barbara. From 1983 through 1990, petitioners were general partners of and each owned a 12.5-percent interest in the LB Partnership.

In 1983, the LB Partnership purchased La Barbara, and La Barbara was stabled in Kentucky. The record does not indicate the purchase price of La Barbara.

Fred Hellman (Hellman) was the managing partner of the LB Partnership. Hellman was responsible for maintaining the books and records of the LB Partnership and for paying all expenses of the LB Partnership.

The LB Partnership made decisions by majority vote of all six partners.

From 1983 through 1990, the LB Partnership bred La Barbara with a number of stallions. The record does not indicate the number of times in each year the partners attempted to breed La Barbara, and the record does not indicate how many foals were produced by La Barbara.

The schedule below summarizes for 1983 through 1988 the net profits and losses allocated from the LB Partnership to petitioners:

Net Profit and Losses
Allocated From LB Partnership

| Year | To Joseph | To Robert |
|------|-----------|-----------|
| 1983 | ($10,199) | ($10,199) |
| 1984 | (  6,035) | (  6,035) |
| 1985 |   5,713   |   5,713   |
| 1986 | (  9,436) | (  9,436) |
| 1987 | (  8,112) | (  8,112) |
| 1988 | ( 15,394) | ( 15,394) |
| Total | ($43,463) | ($43,463) |

## Petitioners' 1988 Tax Returns and Respondent's Audit

Petitioners filed Forms 4868 to extend to August 15, 1989, the time to file their 1988 Federal income tax returns. On these Forms 4868, petitioners estimated that for 1988 their respective Federal income tax liabilities would be zero.

On August 15, 1989, petitioners filed their respective 1988 Federal income tax returns and reported thereon tax liabilities of zero.

With their respective 1988 Federal income tax returns, petitioners attached separate Schedule C's relating to the above-described horse breeding and horse racing activities. Petitioners reported on their respective 1988 Federal income tax returns gross income, losses from their horse breeding and horse racing activities, losses from the LB Partnership, and taxable income, as follows:

| Petitioners | Tax Returns | Horse Breeding Activity | Horse Racing Activity | LB Partnership | Taxable Income |
|-------------|-------------|-------------------------|-----------------------|----------------|----------------|
| Joseph | $ 99,798 | ($35,258) | ($17,621) | ($15,394) | $18,898 |
| Robert* | 150,000 | ( 35,381) | ( 17,749) | ( 15,394) | 45,475 |

* Robert's gross income as reported on Form 1040
includes Kerry's gross income and Robert's taxable
income includes Kerry's taxable income.

On audit for 1988, respondent determined that petitioners
were not engaged in their horse breeding and horse racing
activities for profit, and respondent disallowed the losses
petitioners claimed relating to each activity.  With respect to
the LB Partnership, respondent determined that petitioners did
not materially participate in the LB Partnership and that the
losses realized from the LB Partnership were limited by the
passive income rules of section 469 and could not be used to
offset petitioners' nonpassive income.

For 1988, respondent also determined that petitioners were
liable for additions to tax under section 6651(a)(1) for failure
to timely file their Federal income tax returns, under section
6653(a)(1) for negligence, and under section 6661 for substantial
understatement of income taxes.

OPINION

Petitioners' Horse Breeding and Horse Racing Activities

Under section 183(b)(2), if an activity is not engaged in
for profit, expenses relating thereto are allowable but only to
 the extent gross income derived from the activity exceeds
deductions relating thereto that are allowable under section
183(b)(1) without regard to whether the activity constituted a

for-profit activity.  Allen v. Commissioner, 72 T.C. 28, 33 (1979).

For purposes of section 183, an activity is not considered engaged in for profit unless it constitutes an activity entered into or continued by the taxpayer with an actual and honest or a good faith objective of making a profit.  See Mercer v. Commissioner, 376 F.2d 708, 710-711 (9th Cir. 1967), revg. T.C. Memo. 1966-82; Antonides v. Commissioner, 91 T.C. 686, 693-694 (1988), affd. 893 F.2d 656 (4th Cir. 1990); Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without published opinion 702 F.2d 1205 (D.C. Cir. 1983); Barter v. Commissioner, T.C. Memo. 1991-124, affd. without published opinion 980 F.2d 736 (9th Cir. 1992); Larson v. Commissioner, T.C. Memo. 1986-542, affd. without published opinion 833 F.2d 1016 (9th Cir. 1987); Ruben v. Commissioner, T.C. Memo. 1986-260, affd. without published opinion 852 F.2d 1290 (9th Cir. 1988).

The regulations under section 183 provide a nonexclusive list of factors to consider in determining whether an activity was engaged in for profit.  Such factors include:  (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or

loss with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. Sec. 1.183-2(b), Income Tax Regs.

While the taxpayer's expectation of profit need not be reasonable, the facts and circumstances must demonstrate that the taxpayer engaged in the activity, or continued to engage in the activity, with an objective of making a profit. Golanty v. Commissioner, 72 T.C. 411, 425-426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); Allen v. Commissioner, supra at 33; sec. 1.183-2(a), Income Tax Regs. In determining whether an activity is engaged in for profit, greater weight is given to objective facts than to the taxpayer's mere statement of intent. Sec. 1.183-2(a), Income Tax Regs.

Although no one factor is conclusive, evidence that a taxpayer did not engage in an activity with the objective to earn a profit, a record of substantial losses over many years, and the unlikelihood of achieving a profit are important factors bearing on the taxpayer's true objective. Golanty v. Commissioner, supra at 426; sec. 1.183-2(b)(6), Income Tax Regs. Petitioners have the burden of proof on this issue. Rule 142(a).

Petitioners argue, among other things, that they conducted their horse breeding and horse racing activities in a businesslike manner, that they made appropriate adjustments to the manner in which they operated both activities, and that they

spent substantial time participating in their horse breeding and horse racing activities. Petitioners argue, therefore, that they engaged in their horse breeding and horse racing activities for profit.

Respondent argues, among other things, that petitioners did not operate their horse breeding and horse racing activities in a businesslike manner, that petitioners were not experts in the breeding and racing of horses, and that losses incurred by petitioners in 1988 with respect to both activities were not incurred in an activity engaged in by petitioners for profit.

We agree with respondent. Petitioners advertised their horses for sale in only 2 of the 10 years during which they engaged in their horse breeding and horse racing activities. The fact that petitioners hired trainers, purchased horses, and read periodicals and manuals is equally consistent with engaging in an activity as a hobby and is insufficient in this case to establish a good faith profit objective. Rule 142; Golanty v. Commissioner, supra at 430; Tripi v. Commissioner, T.C. Memo. 1983-483. Petitioners did not operate their horse breeding and horse racing activities in a businesslike manner. Sec. 1.183-2(b)(1), Income Tax Regs.

Petitioners devoted a minimal amount of time to their horse breeding and horse racing activities. Sec. 1.183-2(b)(3), Income Tax Regs.

Petitioners did not establish that any of their broodmares or racehorses appreciated in value or were likely to appreciate in value to the extent that they could earn an overall profit and recoup losses incurred over a 10-year period. See Tripi v. Commissioner, supra; sec. 1.183-2(b)(4), Income Tax Regs.

Petitioners testified that they expected the adjustments they made to their horse breeding and horse racing activities to make both activities profitable. Petitioners, however, did not present any credible evidence establishing that the adjustments they made were likely to make the activities profitable.

From the time petitioners began breeding and racing horses in 1980 until at least 1988, petitioners incurred substantial losses from both activities, and petitioners did not realize any gross income from their horse breeding activity.

Petitioners did not present sufficient evidence at trial to establish that the losses they incurred were due to either customary business risks or unforeseen circumstances. See sec. 1.183-2(b)(6), Income Tax Regs. The realization of continuous and substantial losses over many years from both activities is a strong indication, in this case, that petitioners did not engage in either activity for profit. Golanty v. Commissioner, supra at 426; see sec. 1.183-2(b)(6), Income Tax Regs.

We conclude that petitioners have not established by a preponderance of the evidence that they engaged in their horse

breeding and horse racing activities with an actual and honest or good faith profit objective.

<u>LB Partnership</u>

The passive loss rules of section 469 place limitations on the deduction of losses relating to passive activities, namely, from activities in which a taxpayer does not materially participate. Sec. 469(a)(1) and (2), (c)(1), (d)(1).

As a general rule, a taxpayer will be regarded as not materially participating in an activity if the taxpayer is not involved in the operation of the activity on a basis which is regular, continuous, and substantial. Sec. 469(h)(1); sec. 1.469-5T(a)(7), Temporary Income Tax Regs., 53 Fed. Reg. 5726 (Feb. 25, 1988).

The temporary regulations under section 469 contain seven separate tests, the qualification under any one of which will result in a taxpayer's being treated as materially participating in the activity. Sec. 1.469-5T(a), Temporary Income Tax Regs., 53 Fed. Reg. 5726 (Feb. 25, 1988). Of the seven separate tests, petitioners presented evidence and made general arguments that are applicable only to the test found in section 1.469-5T(a)(7), Temporary Income Tax Regs., <u>supra</u>, which provides that a taxpayer shall be treated as materially participating in an activity if, based on all the facts and circumstances, the taxpayer participates in the activity on a regular, continuous, and

substantial basis during the taxable year. A threshold requirement for meeting this test, however, is that the taxpayer participate in the activity for more than 100 hours during the taxable year. Sec. 1.469-5T(b)(2)(iii), Temporary Income Tax Regs., 53 Fed. Reg. 5726 (Feb. 25, 1988).

A taxpayer may establish the extent of his or her participation in a particular activity by any reasonable means including "the identification of services performed over a period of time and the approximate number of hours spent performing such services during such period, based on appointment books, calendars, or narrative summaries." Sec. 1.469-5T(f)(4), Temporary Income Tax Regs., 53 Fed. Reg. 5727 (Feb. 25, 1988).

Petitioners argue that because they researched possible stallions to breed with La Barbara, because they met with other partners to discuss which breeding options to pursue, and because they voted on which stallions to breed with La Barbara, they should be regarded as materially participating in the LB Partnership, and the losses petitioners realized on their investments in the LB Partnership should be regarded as nonpassive losses, not limited by the passive activity loss provisions of section 469.

Respondent argues that petitioners have not established that they materially participated in the LB Partnership. Respondent argues, therefore, that for 1988, the section 469 passive activity loss rule applies, and the $15,394 loss that petitioners

each realized in 1988 with regard to their investment in the LB Partnership should not be allowed to offset petitioners' nonpassive income.

We agree with respondent. The only evidence presented at trial regarding petitioners' participation in the LB Partnership was Joseph's uncorroborated testimony that he spent hundreds of hours researching potential stallions to breed with La Barbara and the 1988 calendar log that reflected 15 entries for phone calls petitioners made relating to the LB Partnership. The evidence petitioners presented at trial does not establish that petitioners spent over 100 hours participating in the LB Partnership. Petitioners have not met their burden of proof on this issue. See Rule 142; Goshorn v. Commissioner, T.C. Memo. 1993-578.

We sustain respondent's determination that the section 469 passive activity loss rule applies and that petitioners are not permitted to offset the loss from the LB Partnership against their nonpassive income.

Additions to Tax

Section 6651(a)(1) provides that where a taxpayer fails to timely file a Federal income tax return (determined with regard to any valid extension of time for filing) and where such failure is not shown to be due to reasonable cause rather than to willful neglect, there shall be added to the tax due, for each month the

return is not filed, 5 percent of the amount of tax required to be shown on the return, not to exceed 25 percent in the aggregate.

In order for a taxpayer to qualify for an extension of time to file a Federal income tax return, the regulations under section 6081(a) provide that the taxpayer must show on an application for extension of time, among other things, the full amount properly estimated as tax for the year, and the application must be accompanied by a full remittance of the amount properly estimated as tax. Crocker v. Commissioner, 92 T.C. 899, 905 (1989); Garrett v. Commissioner, T.C. Memo. 1994-70; sec. 1.6081-4(a)(4), Income Tax Regs.

A taxpayer will be treated as having "properly estimated" the tax liability when a bona fide and reasonable estimate is made on the extension application of the correct tax liability based on information available to the taxpayer at the time the application for extension is filed. Crocker v. Commissioner, supra at 908; Magowan v. Commissioner, T.C. Memo. 1994-152; Garrett v. Commissioner, supra.

For 1988, the addition to tax for negligence is equal to 5 percent of the underpayment of tax. Sec. 6653(a)(1). Negligence is the failure to make a reasonable attempt to comply with the provisions of the Internal Revenue Code. Sec. 6653(a)(3). Negligence is further defined as a lack of due care or failure to do what a reasonable and ordinarily prudent person would do under

the circumstances. <u>Neely v. Commissioner</u>, 85 T.C. 934, 947 (1985).

The addition to tax for substantial understatement of tax is equal to 25 percent of the amount of the underpayment attributable to the understatement. Sec. 6661(a). In the case of individuals, an understatement is substantial where it exceeds the greater of $5,000 or 10 percent of the amount required to be shown on the taxpayer's return. Sec. 6661(b)(1)(A). The amount of the understatement is reduced by that portion of the understatement that is attributable to the tax treatment of an item by the taxpayer if there was substantial authority for such treatment. Sec. 6661(b)(2)(B).

Respondent argues that petitioners did not properly estimate their income tax liabilities when petitioners filed their extension applications for their 1988 Federal income tax returns and that therefore the extension applications that were filed were invalid and petitioners should be treated as having failed to timely file their 1988 Federal income tax returns. Respondent also argues that petitioners were unreasonable and negligent in, and lacked substantial authority for, claiming on their 1988 Federal income tax returns the losses relating to their horse breeding and horse racing activities and to the LB Partnership. Petitioners bear the burden of proof on each of the additions to tax. Rule 142(a).

We disagree with respondent.  Petitioners herein lost the two substantive tax issues in this case largely because of objective factors not in their favor and because of their burden of proof on those issues.  Petitioners, however, did impress us with their general testimony and credibility.  We note the many cases in which a profit objective has been found to be present in connection with horse breeding and horse racing activities in the face of substantial losses over a number of years.  See e.g., Engdahl v. Commissioner, 72 T.C. 659 (1979); Holbrook v. Commissioner, T.C. Memo. 1993-383; Scheidt v. Commissioner, T.C. Memo. 1992-9; Stephens v. Commissioner, T.C. Memo. 1990-376.

We also believe it appropriate and necessary in this case, particularly in considering additions to tax in the context of an issue arising under section 183, to take into account, as explained previously herein, the fact that the case law and regulatory authority under section 183 establish very clearly that a taxpayer's professed profit objective in engaging in an activity need not be "reasonable".

We conclude, under the facts of this case, that petitioners filed valid extension applications for their 1988 Federal income tax returns and on August 15, 1989, timely filed their 1988 Federal income tax returns.  We also conclude that petitioners were not negligent in filing their 1988 Federal income tax returns, and that petitioners had substantial authority for the

claimed losses relating to their horse breeding and horse racing activities and to the LB Partnership.

Decisions will be entered under Rule 155.