T.C. Memo. 2001-90

UNITED STATES TAX COURT

ROBERT AND KAREN O'CONNOR, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 22345-97.                    Filed April 11, 2001.

John L. Burghardt, for petitioners.

Kathryn K. Vetter, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, Judge:  In a notice of deficiency addressed to petitioners, respondent determined deficiencies and penalties as follows:

|       |            | Penalty      |
|-------|------------|--------------|
| Year  | Deficiency | Sec. 6662(a) |
| 1993  | $114,257   | $22,851      |
| 1994  | 171,550    | 34,310       |
| 1995  | 189,541    | 37,908       |

The issues for our consideration are: (1) Whether petitioners' solely owned S corporation was engaged in a farming activity for profit under section 183 for the taxable years 1993, 1994, and 1995; (2) whether petitioners are entitled to deduct various amounts claimed as contributions; and (3) whether petitioners are subject to the accuracy-related penalties under section 6662(a).[1]

## FINDINGS OF FACT[2]

When they filed their petition, Robert and Karen O'Connor resided in Corning, California. Petitioners owned all of the outstanding shares of Omega Waste Management, Inc. (Omega), which was incorporated in December 1989. Omega filed a Form 1120, U.S. Corporation Income Tax Return, for 1989. In 1990, Omega elected S corporation status.

During the years at issue, Omega was a recycling broker and consulting firm that arranged for hauling of recyclable materials

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable periods under consideration, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2] The parties' stipulation of facts and exhibits are incorporated herein by this reference.

and designed and managed rubbish removal and recycling programs. Omega was also involved in farming activity on approximately 1,400 acres of land leased from the Christian Boys Ranch, Inc. (CBR).

From 1990 through 1995, petitioners reported passthrough income from Omega on Schedules E, Supplemental Income and Loss, attached to their individual income tax returns as follows:

| Year | Net Income |
|------|------------|
| 1990 | $52,303 |
| 1991 | 57,867 |
| 1992 | 51,437 |
| 1993 | 217,787 |
| 1994 | 483,949 |
| 1995 | 660,375 |

For the same period Robert O'Connor (petitioner) reported wages as follows:

| Year | Amount |
|------|--------|
| 1990 | $40,900 |
| 1991 | 52,869 |
| 1992 | 47,394 |
| 1993 | 50,390 |
| 1994 | 53,618 |
| 1995 | 46,894 |

Petitioners organized CBR under the nonprofit laws of the State of California on June 24, 1982. CBR is a section 501(c)(3) corporation for tax reporting purposes. Petitioner has served on CBR's board of directors and as its president since its incorporation in 1982. Karen O'Connor has also served on CBR's board of directors and as CBR's vice president and secretary-

treasurer since 1982.  Unrelated parties have also served on CBR's board of directors.

In 1987, CBR purchased from Ben Larralde (Larralde) an 1,800-acre ranch property in Corning, California.  Three hundred acres of the ranch consisted of an almond orchard.  During the years in issue, the orchard was not irrigated, and most of the almond trees were either dead or stunted from lack of maintenance.  During the years in issue, petitioners maintained their residence on the ranch property.

On May 1, 1990, Omega and CBR entered into a 5-year agreement under which Omega leased from CBR approximately 1,400 acres of ranchland that included the 300-acre almond orchard. Petitioners signed the agreement as officers of both CBR and Omega.  In turn, Larralde then leased the 1,400 acres from Omega for use as grazing land for cattle.  Larralde's rent was based on the number of head of livestock grazing on the property.  To accommodate Larralde, Omega built fences, graded roads, and enlarged ponds. From 1990 through 1995, Omega paid rent to CBR as follows:

| Year | Rent |
|------|------|
| 1990 | $9,000 |
| 1991 | 11,515 |
| 1992 | 21,951 |
| 1993 | 31,865 |
| 1994 | 31,020 |
| 1995 | 43,000 |

Pursuant to the CBR lease, Omega was to furnish any machinery, equipment, water, fertilizer, chemicals, and labor to plant, grow, and harvest any and all crops. Omega was also responsible for all costs and expenses associated with the raising of livestock, including, but not limited to, fencing construction and maintenance, barn maintenance, road maintenance, and feed costs. The maximum number of livestock allowed to graze on the property was 200. Normal repairs were to be absorbed by Omega, but CBR was responsible for major repairs costing more than $2,000. Omega and CBR entered into a new leasing agreement on May 1, 1995. Only petitioner signed the new agreement between CBR and Omega as an officer of both CBR and Omega. The new agreement was similar to the previous lease with CBR; however, Omega would now pay CBR $3,000 per month for the rental of land and $1,400 per month for the rental of certain mobile homes. On its income tax returns for 1990 through 1995, Omega reported receipts and net losses from farming activity as follows:

| Year | Receipts | Net Loss |
|------|----------|----------|
| 1990 | -0- | $39,698 |
| 1991 | $2,692 | 163,687 |
| 1992 | 5,620 | 191,516 |
| 1993 | 12,938 | 148,268 |
| 1994 | 4,385 | 155,156 |
| 1995 | 185 | 135,239 |
| Total | 25,820 | 833,564 |

From 1990 through 1995, Omega's receipts from its farm activity consisted of the following components:

| Year | Pasture Rent | Almond Sales | Livestock Sales |
|------|--------------|--------------|-----------------|
| 1990 | -0- | -0- | -0- |
| 1991 | $2,692 | -0- | -0- |
| 1992 | 5,620 | -0- | -0- |
| 1993 | 12,076 | -0- | -0- |
| 1994 | -0- | $2,363 | $2,021 |
| 1995 | -0- | -0- | 185 |

Petitioner sought and received advice from various advisers and agricultural experts. One such adviser was Jose Collado (Collado), a certified public accountant licensed to practice in the State of California. Before providing accounting services for petitioner, Collado had provided accounting services to almond farmers and cattle ranchers located near the Omega farm activity. Aside from providing accounting services to Omega, Collado regularly advised petitioner to make improvements to Omega's existing farm activity and to consider alternative farming methods in order to lower expenses and increase income. Petitioner was advised to increase the size of Omega's herd, replace dead or unproductive almond trees, and improve irrigation.

In addition to the advice Omega received from Collado, Omega's bookkeeper arranged meetings with various agricultural experts with whom petitioner would discuss changes to Omega's existing farm activity and/or alternative farming techniques suitable to Omega's particular terrain and climate. Petitioner attended a 1-day olive grower's convention where he sought advice

regarding Omega's farm activity.  Petitioner never changed Omega's farming methods or implemented the improvements suggested by Collado or the agricultural experts.

Omega claimed deductions for contributions to CBR consisting of the payment of Omega's employees for the performance of services for the benefit of CBR.  The labor expenses were described as amounts for the building and/or maintenance of corrals, silos, a radius wall, the orchard, a septic system, buildings, equipment, and grounds.  From 1990 to 1995, the amounts claimed by Omega as its section 170(c)(2) contributions of Omega's employees' labor to CBR were as follows:

| Year | Amount |
|------|--------|
| 1990 | $13,170 |
| 1991 | 39,593 |
| 1992 | 20,631 |
| 1993 | 121,149 |
| 1994 | 76,711 |
| 1995 | 95,016 |

These amounts were passed through to and deducted by petitioners subject to adjusted gross income limitations.

In 1990, petitioners made contributions of property to CBR. The donated items included two dismantled metal buildings, one 2,500-gallon butane tank, one Austin-Western Pettybone crane, one Clark forklift, and one sheer press.  Petitioners valued these items at $107,500.  Five of the six donated items were valued by petitioners at over $5,000 each.  Petitioners attached a Form 8283, Noncash Charitable Contributions, to their 1990 Federal

income tax return. The Form 8283 was signed by Jane Dolan (Dolan), a California probate referee, in support of the claimed values. Petitioners were unable to deduct all of the property donations claimed for 1990 because of adjusted gross income limitations.

In 1991, petitioners donated various items to CBR and claimed a deduction of $640,888. Petitioners valued many of the items at more than $5,000 each. Petitioners attached an equipment appraisal letter, a list of the appraised items, and a Form 8283 to their 1991 Federal income tax return. Dolan again signed as appraiser. The Form 8283 contained the statement that the items had been acquired by petitioners between 1964 and 1991, and that all items were purchased for amounts equal to or greater than their appraised values. The items listed, among others, included the following: Mobile buildings; water tanks; bailers; feed; weigh scales; stereo equipment; an aluminum can machine; compactors; pumps; motors; cargo containers; a fire engine; freezers; rubbish bins; canned drink machines; appliances; air-conditioners; kitchen equipment; cattle trailers; conveyors; flatbed trailers; fencing; vehicles; street sweepers; water troughs; furniture; a glass crusher; gates; rolltop bins; a security system; and animals. Each item was: Categorized by its general location at CBR; described as new, used, or discard; and assigned a value. Many of the items were rusted and in a state

of disrepair.  Many of the donated vehicles were inoperable and had not been registered for several years.  Some of the vehicles were over 30 years old.

CBR did not begin its formal operations at the ranch property until after the years in issue.  By the end of 1998, some of the buildings and infrastructure were in place, and CBR was making final preparations to open the ranch property for its charitable purposes.  In 1999, CBR began operating a program in conjunction with Remi Vista, a section 501(c)(3) organization that has operated homes for boys for approximately 27 years.

                            OPINION

The first issue we consider is whether the losses claimed in Omega's farming activity for 1993, 1994, and 1995 were incurred in an activity carried on with an actual and honest profit objective within the meaning of section 183.  Respondent determined that the activities were "not engaged in for profit" within the meaning of section 183(a).  Petitioners must show that respondent's determination is erroneous.  See Welch v. Helvering, 290 U.S. 111 (1933).

It does not appear that Omega engaged in regular and continuous farming activity.  Instead, Omega leased the 1,400 acres of agricultural property from CBR and in turn leased the same acreage to a third party under a per-head grazing arrangement.  Omega depended upon the third-party lease, some of

its own livestock activity, and an almond grove for income. Omega was responsible for expenses in connection with the property and paid CBR rent of more than $30,000 for each of the years under consideration. For 1993, Omega's only receipt from the "farming" activity was $12,076 rent from the third-party lease. For 1994, Omega's only receipts were $2,363 from almond sales and $2,021 from the sale of livestock. For 1995, Omega's only receipt was $185 from the sale of livestock. Finally, we note that Omega's reported expenses for 1993, 1994, and 1995, in addition to the rent to CBR, exceeded $100,000 annually and were generally increasing. Accordingly, Omega's annual expenses vastly exceeded steadily decreasing receipts. With this backdrop we analyze whether Omega's activity was "not engaged in for profit" within the meaning of section 183.

The ordinary and necessary expenses incurred in carrying on an activity which constitutes a trade or business are generally deductible. See sec. 162(a); sec 1.183-2(a), Income Tax Regs. Section 183 provides, in part, that if an individual's or an S corporation's activity is "not engaged in for profit", then no deduction attributable to that activity shall be allowed except as otherwise provided under section 183(b). One of the motivating factors behind the passage of section 183 was the desire to create a more objective standard to determine whether a taxpayer was carrying on a business for the purpose of realizing

a profit or was instead merely attempting to create and use losses to offset his income. See Jasionowski v. Commissioner, 66 T.C. 312, 321 (1976); S. Rept. 91-552 (1969), 1969-3 C.B. 423.

To establish that an activity is one engaged in for profit, a taxpayer must show that the activity was entered into with the dominant hope and intent of realizing a profit. See Wolf v. Commissioner, 4 F.3d 709, 713 (9th Cir. 1993) (profit must be the predominant, primary or principal objective), affg. T.C. Memo. 1991-212; Vorsheck v. Commissioner, 933 F.2d 757, 758 (9th Cir. 1991); Machado v. Commissioner, T.C. Memo. 1995-526, affd. without published opinion 119 F.3d 6 (9th Cir. 1997); Warden v. Commissioner, T.C. Memo. 1995-176, affd. without published opinion 111 F.3d 139 (9th Cir. 1997). We consider whether an activity is engaged in for profit on a case-by-case basis, taking into account the facts and circumstances involved. See Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981).

Petitioners' expectation of profit need not be reasonable, but petitioners must establish that they conducted their activities with a good-faith expectation of making a profit. See Engdahl v. Commissioner, 72 T.C. 659, 666, (1979); Golanty v. Commissioner, supra at 425-426; sec. 1.183-2(a), Income Tax Regs. In assessing a profit motive, greater weight is to be given to objective facts than the taxpayer's mere statement of intent.

See Independent Elec. Supply, Inc. v. Commissioner, 781 F.2d 724, 726-727 (9th Cir. 1986), affg. Lahr v. Commissioner, T.C. Memo. 1984-472; Dreicer v. Commissioner, 78 T.C. 642, 644-645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); sec. 1.183-2(a), Income Tax Regs.

A nonexclusive list of factors set forth in the income tax regulations guides our section 183 analysis by providing relevant facts and circumstances to be considered in determining whether the requisite profit objective has been shown. These factors include: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. See sec. 1.183-2(b), Income Tax Regs. Although no one factor is conclusive, a record of substantial losses over many years and the unlikelihood of achieving a profit are indicative that an activity is not engaged in for profit. See Hildebrand v. Commissioner, 28 F.3d 1024, 1027 (10th Cir. 1994), affg. Krause v. Commissioner, 99

T.C. 132 (1992); Cannon v. Commissioner, 949 F.2d 345, 352 (10th Cir. 1991), affg. T.C. Memo. 1990-148; sec. 1.183-2(a), Income Tax Regs.

Where a taxpayer carries on an activity in a businesslike manner and maintains complete and accurate books and records, where the activity is conducted in a manner substantially similar to that of other comparable businesses that are profitable, and where changes are made to the activity's operating method if necessary to improve profitability, such circumstances indicate that the activity is engaged in for profit. See sec. 1.183-2(b)(1), Income Tax Regs. Similarly, a taxpayer's business plan may tend to show businesslike operations. See Sanders v. Commissioner, T.C. Memo. 1999-208.

The only record of Omega's activity viewed by the Court was a summary containing a review of the farm receipts and expenditures. The summary, however, did not provide the kind of detailed and relevant information that could be used by petitioners or the Court for evaluating the farm activity's profitability, such as: A detailed listing of farm expenses; the number and types of animals bought and sold by petitioners; the number of animals on the property that produced pasture rent; the specific items of farm equipment that were depreciated; and the specific items that were repaired and maintained. Omega maintained only one bank account for both the farm activity and

the recycling business and failed to maintain a budget or make projections as to the future profitability of the farm activity.

There is no indication here that Omega's activity was changed and/or that plans were carried out to ameliorate the substantial excess of expenditures over receipts. Accurate books and records could have provided the data to make educated decisions toward achieving profitability. See, e.g., Wesinger v. Commissioner, T.C. Memo. 1999-372, and the cases cited therein.

There is very little evidence in the record to establish how other comparable and profitable farming activities operate. Given petitioner's business acumen with respect to the recycling business and the fact that petitioners' accountant and others provided guidance with regard to profitability, we find it particularly compelling that petitioner did not follow the advice of his accountant or the agricultural experts with whom petitioner sought counsel and thus continued to permit Omega to incur heavy losses in its farm activity. During a 6-year period, including the years under consideration, Omega's recycling business income increased exponentially while petitioner did nothing to change Omega's farm-activity losses. Omega maintained minimal herds of livestock and did nothing to improve the quality of its crop.

It also appears that petitioner structured Omega's leases with Larralde and CBR to maximize Omega's expenses while no

action was taken to increase the receipts from the farm activity. Petitioner testified that sometimes he did not charge Larralde rent but instead accepted livestock in trade. Pursuant to the existing leases, Omega was required to fix water pumps and mend fences in order to provide adequate water and pasture for Omega's and Larralde's livestock. CBR was required to fix major mechanical failures; however, in reality, Omega paid for these repairs and petitioner claimed the costs as charitable contributions in the form of labor performed by Omega's employees.

According to petitioners, the almond trees on the property were maintained to produce organically grown almonds that could be sold at a higher market price than almonds that were not produced organically. However, petitioner also testified that the almond trees were dwarfed and stunted due to a lack of proper care and could not be watered or chemically fertilized. Therefore, the only way to maximize output from the almond trees while still maintaining organic certification was to replace the dead or stunted trees. Yet, from 1990 through 1995, Omega spent a total of $467 on replacement trees for the orchard. We find it difficult to envision a profitable farm activity where the very crops from which a profit could be derived are not cared for or replaced with regularity.

Petitioners argue that Omega was financially unable to make changes to its farming methods and that property liens kept them from obtaining loans to improve the farm and its profitability. Petitioners' argument does not ring true. Omega's net income, after accounting for farming losses was $217,787, $483,949, and $660,375 for 1993, 1994, and 1995, respectively. Therefore, Omega was capable of acquiring livestock, providing irrigation for the almond orchard, and/or purchasing new trees to replace unproductive ones.

Omega's profitable business activity was hauling and recycling rubbish, and petitioner admits that he had little experience with farming. He argues, however, that his consultations with experts demonstrate petitioners' ongoing effort to bring Omega's farming activity into profitability.

Petitioners did present evidence that advice was sought and received concerning increasing herd sizes and replacing trees in or expanding the orchard. Petitioner also attended a 1-day olive growers convention and sought other related advice regarding Omega's farm operation. Finally, petitioner met with the accountant to discuss the financial statements and the high expenses and paucity of income. In spite of the advice sought and/or received, nothing was done to change the farming activity of Omega. Although petitioner testified that he spent extensive time engaged in Omega's farming activity, there is little in the

record to corroborate his testimony or to show that his efforts were directed at improving profitability. In that regard, it is noted that petitioners lived on the property. In addition, as argued by respondent, petitioner's efforts in operating a successful recycling business limited the time available for petitioner to work on the farming activity.

In this case there was no possibility for increase in the value of the land inuring to Omega because it was a lessee. In addition, there was no expectation that any of the depreciable property used in the farming operation would increase in value. Petitioners also argue that their farm was in existence for only 2 years before the years in issue and therefore it was expected that losses would be sustained for a reasonable period under the circumstances. Petitioners' argument has little merit. From 1990 through 1995, Omega incurred expenditures totaling $833,564 in the farm activity. During the 3 years under consideration, Omega's expenditures totaled $438,663. Accordingly, expenditures were increasing rather than abating. In sharp contrast, over the farm activity's 6-year existence, farm activity receipts totaled

$2,206, $2,363, and $20,388 from the sale of livestock, almonds, and grazing rights, respectively.[3]

During the 3 years in issue, Omega's recycling activities were highly profitable. As discussed above, Omega's net income, after reductions for farm-activity expenses, was $217,787, $483,949, and $660,375 for 1993, 1994, and 1995, respectively. Petitioners also received wages from Omega. The farm activity losses substantially reduced Omega's gross income from its recycling business, which provided significant passthrough tax benefits to petitioners. The receipt of a substantial amount of income from sources other than the activity, especially if the losses from the activity generate large tax benefits, may indicate that the taxpayer does not intend to conduct the activity for profit. See sec. 1.183-2(b)(8), Income Tax Regs.

In summary, petitioners/Omega did not possess the requisite intent to profit from the farm operations. Petitioners are therefore subject to the restrictions set forth in section 183 for activities not engaged in for profit.

Next we consider whether petitioners are entitled to deduct amounts claimed as contributions to CBR during the 1990 and 1991 tax years and carried over into the years in issue. We consider

---

[3] The only sales of almonds occurred in 1994. Most of the farm's income came from pasture rent, which totaled $2,692, $5,620, and $12,076, for 1991, 1992, and 1993, respectively. Omega had no revenue from pasture rent during 1990, 1994, and 1995.

two types of contributions: (1) Whether petitioners properly valued the property contributions of tangible property given to CBR, and (2) whether amounts claimed as paid to Omega's employees for services performed for the benefit of CBR are deductible.

Section 170(a)(1) allows a deduction for charitable contributions (as defined in section 170(c)) made within the taxable year. In general, the amount of a charitable contribution made in property other than money is the fair market value of the property at the time of the contribution. See sec. 1.170A-1(c)(1), Income Tax Regs. Fair market value is defined as the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts. See sec. 1.170A-1(c)(2), Income Tax Regs. Fair market value is a question of fact. See Skripak v. Commissioner, 84 T.C. 285 (1985). Petitioners have the burden of showing their entitlement to their claimed deductions. See Welch v. Helvering, 290 U.S. 111 (1933).

Under section 1.170A-13(b)(3), Income Tax Regs., if a contributed item is valued at over $500, the taxpayer is required to maintain written records showing the manner of acquisition, the fair market value, the method used to determine the value, and the cost or other basis. If a contributed item is valued at over $5,000, the donor must obtain a qualified appraisal for the

contributed property, attach a fully completed appraisal summary to the Federal income tax return, and maintain reasonably detailed records containing a description of the property, the fair market value of the property at the time of the donation, the method used in determining the fair market value, and the cost or other basis. See sec. 1.170A-13(c)(2), Income Tax Regs.

A qualified appraisal shall include, inter alia, a description of the property in sufficient detail for a person who is not generally familiar with the type of property to ascertain that the property that was appraised is the property that was contributed, a description of the physical condition of the property, the qualifications of the qualified appraiser, the method of valuation used to determine the fair market value, and the specific basis for the valuation. See sec. 1.170A-13(c)(3), Income Tax Regs. The appraisal summary shall include, inter alia, a description of the property in sufficient detail for a person who is not generally familiar with the type of property to ascertain that the property that was appraised is the property that was contributed, a brief summary of the physical condition of the property, the manner of acquisition, and the cost or other basis. See sec. 1.170A-13(c)(4), Income Tax Regs.

Respondent argues that petitioners are not entitled to deductions for the carryover[4] of charitable contributions from 1990 and 1991 to 1993, 1994, and 1995 because the fair market values of the contributed property carried over from 1990 and 1991 have not been established. Petitioners claimed as separately computed passthrough deductions from Omega noncash charitable contributions of tangible property to CBR of $107,500 and $640,888 for 1990 and 1991, respectively. Because of 50-percent limitation, petitioners could not deduct all of their claimed contributions during the 1990 and 1991 tax years. Because they claimed contribution carryovers from the 1990 and 1991 tax years, these years' contributions are at issue in this case.

There is no dispute about whether the property was contributed to CBR. Instead, the question is whether the values claimed represent the fair market values of the items contributed. To establish fair market values for the tangible property contributed to CBR, petitioners employed Dolan, a probate referee licensed by the State of California. Dolan submitted an appraisal report to petitioners. We find, on the

---

[4] Generally, in the case of individuals, deductions for charitable contributions are limited to 50 percent of adjusted gross income. See sec. 170(b)(1)(A). Excess contributions may be carried forward for up to 5 years. Carryover contributions are deducted after deducting current year contributions. If there are carryovers from more than 1 prior year, the carryover from the earlier year is used first. See sec. 170(d)(1).

basis of photographs and other evidence in the record, that the appraisal report inadequately describes the physical condition of the items. See sec. 1.170A-13(c)(3)(ii)(B), Income Tax Regs. Additionally, the appraisal does not contain the method of valuation that the appraiser used when attributing values to the property. See sec. 1.70A-13(c)(3)(ii)(J), Income Tax Regs. Finally, the appraisal does not contain the specific basis for the valuation. See sec. 1.170A-13(c)(3)(ii)(K), Income Tax Regs. Petitioners were unable to explain the absence of the required information. The items were generally described as "new", "used", or "discard", and in a limited number of cases "good", "fair", or "dismantled". Without a more detailed description the appraiser's approach and methodology cannot be evaluated. In that regard, the appraiser was not called to testify, and no other appraisers were offered by petitioners. Accordingly, petitioners have not fully complied with the requirements imposed by the regulations. See sec. 1.170A-13(c), Income Tax Regs.

Although petitioner testified as to the condition of the contributed items, his testimony was evasive on cross-examination, and his testimony was inconsistent with photographic evidence of the contributed property. Many of the items contributed by petitioners, such as mechanized farm equipment, industrial machinery, fuel tanks, and vehicles appear to be rusted and in a state of disrepair. Petitioners offered no sales

receipts, canceled checks, or other contemporaneous evidence that could aid in the valuation of the contributed property.[5] Accordingly, petitioners have not shown that they are entitled to deductions greater than the amounts already claimed during the 1990 and 1991 tax years.

Next we consider whether petitioners may claim contributions for unreimbursed expenses incurred by Omega in connection with services performed by Omega employees for the benefit of CBR. Petitioners contend that certain services performed by Omega employees at the behest of petitioners and for the benefit of CBR entitle petitioners to deduct as passthrough charitable contributions the salaries paid in connection with services performed. Respondent argues that petitioners are not entitled to a deduction for the salaries paid to Omega employees for work performed on the ranch because the work benefited Omega.

There are in dispute charitable "cash contributions"[6] of $121,149, $76,711, and $95,016 for the tax years 1993, 1994, and 1995, respectively. Aside from petitioner's self-serving testimony, petitioners submitted a schedule showing some of the pay periods during the years in issue; however, the schedule is

---

[5] Petitioners' only receipt was for a mobile home with a purchase date of June 13, 1983, at a price of $19,500. It is not known whether this mobile home was an item contributed to Christian Boys Ranch, Inc. (CBR).

[6] In effect, these are gifts of services as opposed to cash contributed to CBR.

incomplete, and at least one page has been submitted twice.[7] Although the schedule identifies specific employees, the number of hours each employee worked, and the general areas where work was performed, the schedule does not show Omega's actual cost of labor, nor does the schedule break down the specific services performed. The labor expenses included amounts for the building and/or maintenance of corrals, silos, a radius wall, the orchard, a septic system, buildings, equipment, and grounds. Omega was already obligated for some of these expenditures under the CBR/Omega agreement. Further, petitioners have not shown whether Omega had already claimed deductions for the same labor expenses as employees' salaries. Importantly, it appears that the services could have benefited Omega and/or petitioners, and they have not shown how CBR obtained primary benefit from the services. See Babilonia v. Commissioner, 681 F.2d 678 (9th Cir. 1982), affg. per curiam T.C. Memo. 1980-207.

Petitioners relied on their bookkeeper to notify the accountant/tax preparer as to which expenses benefited Omega and which benefited CBR. However, petitioners began living on the CBR ranch property several years before CBR opened its doors for operation in 1999. Because they lived on the CBR property before

---

[7] Several periods are missing from each year a cash deduction was claimed. Most periods from 1995 were omitted.

its opening, petitioners also may have personally benefited from the services contributed.

Petitioners' poor record keeping and inability to show that all of the expenditures were for the benefit of CBR is of their own making. However, the record establishes that CBR benefited directly and primarily from certain of the services of Omega employees. After considering all of the evidence, we hold that petitioners are entitled to claim contributions for services by Omega to CBR of $3,300, $9,900, $5,200, $30,000, $19,000, and $24,000 for the tax years 1990, 1991, 1992, 1993, 1994, and 1995, respectively.[8]

The final issue for our consideration is whether petitioners are liable for the accuracy-related penalties under section 6662, which respondent determined were due to negligence, disregard of rules and regulations, and substantial understatement of income tax. An accuracy-related penalty is imposed on a taxpayer if any portion of an underpayment of tax is attributable to either negligence or disregard of rules or regulations or any substantial understatement of income tax. See sec. 6662(a) and (b)(1) and (2). The term "negligence" includes any failure to make a reasonable attempt to comply with the provisions of the Internal Revenue Code, and the term "disregard" includes any

---

[8] Amounts are decided for the years 1990, 1991, and 1992 for purposes of determining the amount of the carryover, if any, to the years before the Court.

careless, reckless, or intentional disregard. See sec. 6662(c). Negligence also includes any failure by the taxpayer to keep adequate books and records or to substantiate items properly. See sec. 1.6662-3, Income Tax Regs. An individual taxpayer's understatement is substantial if the amount of the understatement exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000. See sec. 6662(d)(1)(A). The accuracy-related penalty is not to be imposed if it is shown that there was reasonable cause for the underpayment and that the taxpayer acted in good faith. See sec. 6664(c)(1). Petitioners have the burden of showing that they are not liable for the accuracy-related penalties. See Welch v. Helvering, 290 U.S. 111 (1933).

In support of his determination, respondent contends that petitioners allowed the accumulation of substantial amounts of losses from Omega's farm activity to reduce the income produced by Omega's recycling business. Respondent's contention that Omega's farming activity was continued for the purpose of using losses to reduce Omega's highly profitable recycling business income is supported by the facts. The size of Omega's expenditures compared to the meager revenue it received without attempting to increase receipts or cut expenses, on this record, supports no other conclusion. Over a 6-year period, Omega's farm activity generated losses totaling $833,564, with gross receipts totaling only $25,820. There is no other apparent motivation in

the record for continually incurring these unabated expenditures. We also note that petitioners maintained their residence on the ranch property and it was the situs for future charitable activity, to commence a few years after the years under consideration.

Respondent also argues that petitioners claimed large overvalued deductions for contributions of property to CBR in 1990 and 1991. In addition, respondent contends that petitioners failed to furnish a qualified appraisal identifying the values of items contributed to CBR as required by the regulations. We have already held that petitioners' property valuations are substantially overstated and that contributions of labor to CBR are deductible in greatly reduced amounts.

Petitioners argue that any underpayment was reasonable because they acted in good faith and they relied on the advice of a certified public accountant to whom they provided complete and accurate records. The evidence does not bear out petitioners' argument. Instead, the record reflects that petitioners failed to follow the advice of their accountant with regard to achieving profitability in their farm operation. They have not established that they acted in good faith. In addition, petitioners failed to provide adequate records to support their claimed deductions for contributions to CBR. Thus, petitioners have not shown that their actions were reasonable or that they attempted to comply

with the Internal Revenue Code and the underlying regulations. We therefore hold petitioners liable for the accuracy-related penalties.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155.</u>