T.C. Memo. 2001-106

UNITED STATES TAX COURT

JAMES TINNELL, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 20318-97.                    Filed May 4, 2001.

<u>W. Leslie Sully, Jr.</u>, for petitioner.

<u>Paul L. Dixon</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, <u>Judge</u>:  Respondent determined the following
deficiencies, additions to tax, and penalties with respect to
petitioner's Federal income taxes:[1]

---

[1]All section references are to the Internal Revenue Code in
effect for the years in issue, and all Rule references are to the
Tax Court Rules of Practice and Procedure.  Monetary amounts are
rounded to the nearest dollar.

|       |            | Additions to tax and penalties | | |
|       |            | Sec. | Sec. | Sec. |
| Year  | Deficiency | 6651(a)(1) | 6654 | 6662(a) |
| 1991  | $146,062   | $15,132 | $10,810 | $29,212 |
| 1992  | 100,517    | 8,041 | 4,384 | 20,103 |
| 1993  | 405,936    | 38,703 | 4,837 | 81,187 |
| 1994  | 134,217    | 15,582 | 10,107 | 26,843 |

Following concessions,[2] the issues for decision are:[3]

(1)  Whether petitioner's mining activity for 1991, 1992, 1993, and 1994 constituted an activity engaged in for profit within the meaning of section 183; and

(2)  whether petitioner is liable for the accuracy-related penalty due to negligence under section 6662(a) for each year in issue.

---

[2]In a Stipulation of Settled Issues filed with the Court, the parties agreed:  (1) Petitioner's claims of alimony paid in 1991 and 1992 were overstated by $57,595 and $600, respectively; (2) petitioner understated capital gain in 1992 by $23,380; (3) petitioner understated royalty income from Zila, Inc., in 1992 by $3,726; and (4) petitioner is not liable for additions to tax pursuant to sec. 6651(a)(1) or sec. 6654, as determined in respondent's notices of deficiency, for 1991, 1992, 1993, and 1994.  In a second Stipulation of Settled Issues filed with the Court, the parties agreed:  (1) In 1991, petitioner was entitled to claim a net operating loss deduction of $128,461 instead of the $23,995 originally claimed; (2) in 1993, petitioner originally claimed a net operating loss carryforward deduction of $101,898, and the parties agreed there is no net operating loss carryforward available for deduction, unless and except to the extent any determination by the Court with respect to the Schedule C mining activity in 1991 or 1992 results in a carryforward of net operating loss; and (3) in 1993, petitioner understated ordinary income from the exercise of stock options in Zila, Inc., by $282,979.

[3]The only other issues for decision are computational.

## FINDINGS OF FACT[4]

The parties have stipulated some of the facts, which we incorporate in our findings by this reference. Petitioner was a resident of Las Vegas, Nevada, when the petition in this case was filed.

Petitioner graduated from the University of Arkansas School of Medicine in 1962. In 1965, petitioner began practicing medicine in Lewisburg, Tennessee. Five years later, petitioner relocated his medical practice to Chattanooga, Tennessee. Petitioner has been engaged in the practice of medicine at all relevant times.

## I. Delta Roofing Mills

In or about 1973, petitioner and his father purchased Delta Roofing Mills, a roofing manufacturing business in Slidell, Louisiana, for approximately $1 million. Petitioner participated in the management and marketing of Delta Roofing Mills, which tripled its gross sales while petitioner and his father owned it. Five years after petitioner and his father purchased Delta Roofing Mills, they sold it to Republic Gypsum Corp. for approximately $3 million and split the net sale proceeds.

---

[4]In his opening brief, petitioner set forth "Proposed Findings of Fact" that were in essence ultimate findings of fact. By neglecting to follow Rule 151(e), which requires petitioner to include numbered proposed findings of fact, petitioner has "assumed the risk that we have not considered the record in a light of * * * [his] own illumination." Monico v. Commissioner, T.C. Memo. 1998-10.

II.  Zila Pharmaceuticals, Inc.

In 1974, petitioner relocated his medical practice from Chattanooga, Tennessee, to Las Vegas, Nevada.  In conjunction with his medical practice, petitioner began doing research on herpes.  During the late 1970's, petitioner invented a cream called Herpaway (cream) for the topical treatment of herpes.

In September 1980, petitioner and his partner, Dr. Edwin D. McKay, formed a pharmaceutical manufacturing business called Zila Pharmaceuticals, Inc., a Nevada corporation, to manufacture and distribute the cream.[5]  Effective September 1, 1988, Zila Pharmaceuticals, Inc., became a wholly owned subsidiary of Zila, Inc. (Zila), a Delaware corporation.  Today, the cream is called Zylactin and is being sold as an over-the-counter treatment for herpes.  At the time of trial, Zila had over 200 employees and a market capitalization of approximately $200 million.  At all relevant times, petitioner has received royalties from Zila from sale of the cream.

III.  Petitioner's Mining Activities

A.  Commencement of Petitioner's Mining Activities

In 1978, petitioner began reading prospecting books and became interested in mining.  Petitioner attended shows and seminars about mining and purchased numerous books on geology and

---

[5]Before the formation of Zila Pharmaceuticals, Inc., petitioner acquired a corporate shell company called Dusenberg Replicar, which later became Zila Industries.

mining at the University of Nevada bookstore.  Petitioner also learned how to read geological mining maps.  Petitioner began searching for gold and other precious metals on Federal land in Clark County, Nevada.  By 1979, petitioner began locating mining claims near Searchlight, Nevada.

On March 5, 1980, petitioner formed Jetco Enterprises, Inc. (JEI), a Nevada corporation.  Although petitioner apparently planned to conduct his mining activities through JEI at some point, petitioner did not use JEI during the years at issue or in prior years to report the results of his mining activities.  Instead, petitioner conducted his mining activities as a sole proprietorship doing business as Jetco Mining.[6]  Over the years, petitioner employed his two sons, his daughter, and an ex-brother-in-law in his mining activity.[7]

---

[6]JEI, through and including the years at issue, did not file Federal income tax returns.  JEI, however, issued shares of stock, held board meetings, kept minutes of corporate activities, and otherwise observed all the formalities of a corporation.  At the time of trial, JEI was in good standing with the secretary of state of Nevada.  Petitioner is the sole shareholder and president of JEI.  Petitioner's sons, L.R. Tinnell and Jaye E. Tinnell, are secretary and treasurer, respectively.  JEI's fiscal tax year ends Jan. 31.

[7]At the time of trial, petitioner still employed his two sons in his mining operation.

During 1980, petitioner located and staked at least 47 lode mining claims in Clark County, Nevada.[8] During the 1980's, petitioner conducted exploration and development activities with respect to his claims. As of February 2000, petitioner had on file and of record more than 300 lode mining claims. A "Resource Management Plan" map, dated August 1, 1997, prepared by and for the U.S. Department of the Interior, Bureau of Land Management (BLM), indicated there is "high mineral potential" on and around petitioner's mining claims.

B.  Petitioner's Early Efforts To Generate Income From Mining

Petitioner engaged in business discussions regarding his mining activities with various parties and entities. In December 1982, petitioner discussed the possible sale of ore to Cash Industries of Idaho (Cash Industries) for processing at Cash Industries' facilities. During December 1982 and January 1983, petitioner and Cash Industries conducted a sampling program and numerous assays on petitioner's claims. No sale resulted.

In April 1983, petitioner engaged in discussions with Lud Carrao, the owner of a construction company, regarding a joint venture in mining. The venture was subject to proof of the economic and commercial value of petitioner's claims. Petitioner

---

[8]Most of petitioner's claims were located in the Newberry Mountains southeast of Searchlight, Nevada, which is an area recognized for its high mineral potential.

engaged in negotiations with Mr. Carrao, but no agreement was reached.

In May 1983, Century Capital Corp. explored investment in petitioner's mining venture but never raised any money for the venture.[9]

In November 1983, petitioner engaged in discussions with Canorex International, Inc., of Colorado regarding a lease of petitioner's claims.  No agreement was reached.

In 1983 and 1984, petitioner pursued a gold mining venture in Lochiel, Arizona, on the U.S.-Mexico border.  The operation produced an ounce to an ounce and a half of gold per day.  The price of gold had fallen significantly, however, and the operation was not profitable.  Soon thereafter, the operation was shut down.

Upon discontinuing mining in Arizona, petitioner moved his equipment to Colorado and began another mining operation with a "guy with a placer operation".  The Colorado "guy" misrepresented the amount of gold available, however, and petitioner terminated his involvement in the operation.

Petitioner returned to Las Vegas, Nevada, and, disappointed with the last two unsuccessful ventures in Arizona and Colorado, did not attempt to develop any mining ventures except his own

---

[9]Century Capital Corp. was also involved in the private placement of Zila.

claims. Petitioner continued to talk to people about mining, to read about mining, and to go to meetings about mining during this period.

In 1986, petitioner and a local real estate attorney, Darrell Clark, representing Great Western Basin Corp. (Great Western), negotiated a mining lease. The lease was conditioned on testing and sampling of petitioner's claims. An independent geologist prepared a report for Great Western that set forth numerous recommendations and conclusions. In September 1986, petitioner and Great Western entered into a lease whereby petitioner agreed to lease his mining claims to Great Western for the purposes of prospecting, exploring, drilling, mining, and operating the property for ores and minerals. Great Western made no payments to petitioner, however, and defaulted on the lease.

In 1988, petitioner began consulting with Kent Kjelberg at the Rattlesnake Mine in California. Petitioner provided extensive equipment and knowledge to the Rattlesnake Mine. Petitioner was not paid for the use of his equipment or for the information he provided, but he was promised a portion of the income produced from the Rattlesnake Mine. Ultimately, petitioner received only an old grader.

In or about 1988, petitioner began to disengage from his pharmaceutical activities at Zila and began spending more time on his mining activities.

C.  Petitioner's Mining Plan of Operations

On May 5, 1989, petitioner submitted a proposed mining plan of operations to the BLM for approval.[10]  On January 12, 1993, the BLM approved petitioner's plan of operations.  During the BLM's investigation of petitioner's plan of operations, from 1989 through 1993, petitioner incurred substantial expenditures to develop a production mill, purchase an induction furnace,[11] and

---

[10]In order to initiate mining activity on Federal land, a claimant must first file a 2-week notice, which allows the claimant to disturb up to 2 acres of land per year.  If the claimant desires to disturb more than 2 acres, a plan of operations must be approved by the BLM.  Once a plan of operations is filed, the BLM conducts an investigation before approving the plan.  In petitioner's case, the BLM's investigation lasted approximately 3 to 4 years, during which petitioner was allowed to erect facilities on his claims with the knowledge of the BLM.  The expenses incurred in erecting those facilities are reflected in petitioner's tax returns for those years.

[11]At some point, petitioner entered into a contract with Inductotherm to perform a series of test smelts to determine whether recoveries from his claims could be enhanced through the use of induction smelting.  Inductotherm provided an induction furnace in Los Angeles, and petitioner and his son L.R. Tinnell performed a series of seven smelts at Inductotherm's facilities (which created doré bars).  Petitioner and L.R. Tinnell performed tests on the doré bars, the results of which were favorable.  Thereafter, petitioner communicated with Union Miniere in Belgium, which sent a local representative to perform an analysis on petitioner's doré bars.  On the basis of a favorable report from Union Miniere, petitioner began making arrangements to upgrade his mill capacity.  In 1993, petitioner purchased an induction furnace from Ajax Magnathermic in order to increase the capacity of his mill from 1 ton per hour to 10 tons per hour.  The purchase price of the induction furnace was about $50,000.  Petitioner made approximately 15 doré bars with the induction furnace.  The induction furnace, however, has not been operated since 1996.

secure mineral surveys.  Further, beginning in 1991, petitioner caused various claims to be surveyed with the objective of patenting those claims.  On January 20, 1994, petitioner applied for a mineral patent for some of his claims.[12]  To date, however, petitioner has not received any patents with respect to his claims.

D.  Tinnell Prospect

In 1992 and early 1993, petitioner explored and prospected an area known as the Tinnell Prospect, consisting of a group of claims in the northwest corner of petitioner's claim block. Horizon Securities, a securities firm that does private placements for young companies, sent a geologist, Michael Cruson,[13] to perform a geologic evaluation of the area.  Mr. Cruson prepared a report, dated January 15, 1993, and made three recommendations:  (1) No further work is justified on the claims covered by the Tinnell Prospect; (2) any future work in the area

---

[12]Petitioner claimed that since 1994 there was a moratorium on the issuance of mineral patents from the BLM.  Apparently, petitioner missed the deadline to apply for a mineral patent by 1 day, and his application was returned to him.

[13]Michael Cruson has a geological engineering degree and a Ph.D. in geology from the Colorado School of Mines.  Mr. Cruson has been engaged in the business of geological engineering since 1973.  Mr. Cruson's clients include major oil companies in the United States; i.e., Phelps Dodge, Texaco, Chevron, Exxon; and major mining companies in the United States; i.e., Kenicott, Mobil, Newmont, and Cypress AMAX.  At the time of trial, Mr. Cruson was conducting a feasability study on the Sarmish gold deposit site in Pakistan that was discovered in the early 1970's.

should be to the southeast where documented gold shows are concentrated;[14] and (3) the onsite sample preparation and assaying methods should be carefully evaluated. As a result of Mr. Cruson's recommendations, petitioner abandoned the claims covered by the Tinnell Prospect. Thereafter, petitioner devoted his attention to the Quartette Mine.

### E. Quartette Mine

From 1991 through March 1996, petitioner pursued the development and exploration of the Quartette Mine near Searchlight, Nevada. The Quartette Mine was owned by the Miller family.[15] The Millers were interested in having petitioner lease their mine so that petitioner could transport rock from the Quartette Mine to his mill site where it would be crushed and processed.[16]

Petitioner hired Mr. Cruson to evaluate the Quartette Mine. Mr. Cruson prepared a report, dated December 10, 1993, containing six conclusions and five recommendations. Significantly, Mr.

---

[14]This area was located near petitioner's mill site (also known as the Roman mine site) and represents the bulk of petitioner's claim area.

[15]L.R. Tinnell was married to one of the Millers. They were divorced by 1993 but remained relatively close.

[16]In November 1993, petitioner formed Complex Resources Development (CRD) to take advantage of the development of the Quartette Mine and petitioner's claims. CRD was intended to be the operating company of a future joint venture controlling the Quartette mining operations. CRD never became active and never filed a Federal income tax return.

Cruson concluded that "The Quartette Mine was a significant producer of high grade gold ore." Mr. Cruson recommended that petitioner: (1) Acquire control of the Quartette Mine; (2) carry out a detailed geologic study to determine the ore controls and outline exploration targets; (3) examine the feasibility of applying new geophysical or geochemical techniques at the Quartette Mine; (4) develop a detailed history of the Quartette Mine to determine cutoff grades during production; and (5) test the targets defined by the earlier geologic study by drilling. Petitioner followed all the recommendations outlined in Mr. Cruson's report.

On April 1, 1994, petitioner[17] acquired the rights to mine and purchase the Quartette Mine ore. Exploratory drilling to determine the economic viability of the mine was conducted from September 7 to November 5, 1994. Mr. Cruson and his partner, Kent E. Carter, prepared an evaluation of the Quartette Mine, dated January 20, 1995, that stated: "Overall the scout drilling and exploration program was a resounding success". Mr. Cruson "strongly recommended" that petitioner continue excavating, begin preliminary mine planning, and initiate a second round of drilling and exploration designed to delineate the new copper-

[17]The lease for the Quartette Mine was not made part of the record, and we assume the parties to the lease were the owners of the Quartette Mine and petitioner. Nevertheless, because JEI did not function as a tax reporting entity during the years at issue, we attribute the mining activities to petitioner.

gold vein discovery.  Mr. Cruson estimated the total budget for the next phase of drilling would be about $250,000.

Petitioner recovered approximately 4 ounces of gold from the Quartette Mine, and the project was abandoned in 1996.

F.  Petitioner's Sale of Decorative Rock

After petitioner abandoned his efforts to develop the Quartette Mine, petitioner expanded his business to include the sale of decorative rock in an effort to generate revenue.  In 1994 and 1995, petitioner "tried to break into the wholesale market" and realized it was almost impossible.  Thereafter, petitioner opened a "rock yard" for the retail sale of rock and gravel from his claims.  Petitioner purchased an advertisement in the telephone directory yellow pages.  At the time of trial, petitioner had been selling decorative rock for 4 years.[18] During those years, petitioner's gross income from the sale of

---

[18]When petitioner's plan of operations was approved, the BLM, acting in error, granted petitioner permission to dispose of sand and gravel from what petitioner claimed would be "tailings" from his placer operations.  Subsequently, inspectors from the BLM observed stockpiles of what appeared to be decorative rock, and BLM Law Enforcement reported that petitioner was selling decorative rock in the Las Vegas market.  On Feb. 8, 1999, the Las Vegas Field Office of the BLM sent a decision to petitioner directing him to halt the sale of "tailings" and "non-locatable" minerals.  On or about Apr. 30, 1999, petitioner filed an appeal from the BLM decision.  Petitioner hired a mining law attorney to represent him with respect to the BLM's decision and a geologist to determine whether petitioner is mining "locatable" minerals. At the time of trial, the matter was still on appeal, and petitioner was still selling decorative rock.

decorative rock has grown steadily, and petitioner continues to generate substantial income from the sale of decorative rock.

G. Financing of Mining Activities

Petitioner financed most of his mining activity with royalties from Zila, the sale of Zila stock, and the exercise of stock options in 1993.  Since 1980, no outside investor has supplied capital for any of petitioner's mining activities. Petitioner sold shares of Zila stock when he needed money and borrowed money secured by his Zila stock.

IV. Petitioner's Tax Returns

A. Mining Activities

On petitioner's Federal income tax returns for tax years through 1997, petitioner treated all of his mining activities as a single Schedule C activity doing business as Jetco Mining.[19] For the years 1980 through 1988, petitioner had no income from mining activities.  During the years from 1989 through 1999, petitioner reported, either directly on a Schedule C or indirectly through JEI, gross revenues and expenses from his mining activities as follows:

---

[19]JEI initially made an election to be treated for tax purposes as a "pass-through" S corporation but did not file any tax returns until 1998.  Respondent does not assert that any expenses claimed by petitioner with respect to the taxable years at issue are disallowable because of the failure of JEI to file Federal income tax returns.

| Year | Revenue | Cost of goods sold and other cash expenses | Depreciation |
|------|---------|-----------------------------|--------------|
| 1989[1] | -0- | $113,273 | $19,063 |
| 1990 | -0- | 166,786 | 23,102 |
| 1991 | -0- | [2]359,627 | [2]41,265 |
| 1992 | $700 | [2]286,217 | [2]41,902 |
| 1993 | -0- | [2]400,292 | [2]32,829 |
| 1994 | 2,100 | [2]591,704 | [2]45,664 |
| 1995 | 2,900 | 558,142 | 73,315 |
| 1996 | -0- | 488,521 | 76,476 |
| 1997 | 32,364 | 363,923 | 41,101 |
| 1998 | 126,170 | [3]464,900 | [3]93,624 |
| 1999 | 373,566 | [3]322,328 | [3]83,960 |

[1]For taxable years 1989 and 1990, petitioner's original returns were examined, and no change resulted. For those same years, petitioner filed amended returns that claimed additional losses from his mining activities. These claims were examined by respondent and resulted in loss carryforwards allowed in 1991.

[2]The parties agree that these amounts are deductible unless disallowed by sec. 183. Respondent does not assert that any of petitioner's mining expenses with respect to the taxable years 1991 through 1994 should be disallowed as a result of the application of sec. 616 or 617.

[3]Expenses claimed on returns filed on behalf of JEI.

B. Zila Royalties and Stock Options

From 1989 through 1998, petitioner reported royalty income from Zila as follows:

| Year | Royalty Income |
|------|----------------|
| 1989 | $82,933 |
| 1990 | 185,578 |
| 1991 | 213,507 |
| 1992 | [1]180,895 |
| 1993 | 222,439 |
| 1994 | 224,717 |
| 1995 | 277,663 |
| 1996 | 305,002 |
| 1997 | 344,332 |
| 1998 | 372,119 |

[1]Petitioner originally reported $177,169 of royalty income in 1992. The parties stipulated an increase in this amount to $180,895.

In 1993, petitioner exercised options to purchase 380,000 shares of Zila stock worth $1,116,250 for an exercise price of $285,000. After taking into account Zila's blockage discount of $282,979, petitioner realized ordinary income of $548,271 on the exercise of his stock options. On petitioner's 1993 Federal income tax return, he claimed an additional discount of $282,979, asserting that the sale of his Zila shares was restricted. Petitioner reported the income from the exercise of his Zila stock options on a supporting schedule attached to his 1993 return and attached an additional schedule fully describing the total options exercised, the exercise amount, the fair market value, the exercise price, the per-share blockage discount applied by Zila, the amount of ordinary income to petitioner

reported by Zila,[20] and the additional discount for restrictions on stock taken by petitioner (marketability discount).  The schedule contained the following statement concerning the marketability discount:

> THIS DISCOUNT TAKEN BECAUSE TAXPAYER FEELS THAT STOCK
> WOULD BE SEVERELY EFFECTED IF HE PUT ALL THESE SHARES
> ON MARKET IN ONE BLOCK.  IN ADDITION TAXPAYER CANNOT
> SELL SHARES FOR THESE YEARS PER SEC REGULATIONS.
> THEREFORE, PRESENT VALUE IS LESS.

Petitioner, however, did not make the disclosure on Form 8275, Disclosure Statement, or Form 8275-R, Regulation Disclosure Statement.  Petitioner and respondent have agreed that petitioner is entitled to only a single discount of $282,979.

C.  Medical Practice

From 1989 through 1998, petitioner reported income and losses from his medical practice as follows:

| Year | Income (Loss) |
| --- | --- |
| 1989 | ($10,617) |
| 1990 | (15,235) |
| 1991 | (3,732) |
| 1992 | 12,738 |
| 1993 | 36,723 |
| 1994 | 20,574 |
| 1995 | 10,547 |
| 1996 | 8,151 |
| 1997 | 5,449 |
| 1998 | 7,689 |

---

[20]The additional schedule indicated the amount of petitioner's ordinary income as "ORDINARY INCOME-1099".  We assume this indicates that petitioner's ordinary income was reported on Form 1099.

During this period, petitioner spent most of his time and effort on his mining activities and relatively little time maintaining his medical practice.

OPINION

I.   Section 183(a) Deductions

A.   In General

Section 183(a) provides that if an activity is not engaged in for profit, no deduction attributable to the activity shall be allowed except as provided in section 183(b).  Section 183(b)(1) allows those deductions that otherwise are allowable regardless of profit objective.  Section 183(b)(2) allows those deductions that would be allowable if the activity was engaged in for profit, but only to the extent that gross income attributable to the activity exceeds the deductions permitted by section 183(b)(1).  Section 183(c) defines "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212."

Deductions are allowable under section 162 for the expenses of carrying on an activity that constitutes a trade or business of the taxpayer.  See sec. 162(a); sec. 1.183-2(a), Income Tax Regs.  To be engaged in a trade or business with respect to which deductions are allowable under section 162, "the taxpayer must be involved in the activity with continuity and regularity," and

"the taxpayer's primary purpose for engaging in the activity must be for income or profit". Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987); see also Warden v. Commissioner, T.C. Memo. 1995-176, affd. without published opinion 111 F.3d 139 (9th Cir. 1997).

This case is appealable to the Court of Appeals for the Ninth Circuit, which applies a primary purpose standard to test whether an alleged business activity has the requisite profit motive under sections 162 and 183. Before a deduction is allowed, "'it must be shown that the activity was entered into with the dominant hope and intent of realizing a profit.'" Vorsheck v. Commissioner, 933 F.2d 757, 758 (9th Cir. 1991) (quoting Brannen v. Commissioner, 722 F.2d 695, 704 (11th Cir. 1984), affg. 78 T.C. 471 (1982)); see also Wolf v. Commissioner, 4 F.3d 709, 713 (9th Cir. 1993), affg. T.C. Memo. 1991-212; Machado v. Commissioner, T.C. Memo. 1995-526, affd. without published opinion 119 F.3d 6 (9th Cir. 1997); Warden v. Commissioner, supra. We apply that standard here.

Whether the requisite profit objective exists is a question of fact to be resolved after considering all the pertinent facts and circumstances. See Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); sec. 1.183-2(b), Income Tax Regs. The taxpayer's expectation of profit need not be reasonable, but it must be bona

fide. See Golanty v. Commissioner, supra at 425-426. Although our analysis focuses on the subjective intention of the taxpayer, greater weight is given to objective facts than to a taxpayer's mere statement of intent. See Independent Elec. Supply, Inc. v. Commissioner, 781 F.2d 724, 726 (9th Cir. 1986), affg. Lahr v. Commissioner, T.C. Memo. 1984-472; Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Churchman v. Commissioner, 68 T.C. 696, 701 (1977); sec. 1.183-2(a), Income Tax Regs. Petitioner bears the burden of proving he had the requisite profit objective. See Rule 142(a); Golanty v. Commissioner, supra at 426.

Section 1.183-2(b), Income Tax Regs., sets forth a nonexclusive list of factors to be considered in determining whether the taxpayer has the requisite profit objective. The factors are: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. No single factor is

determinative, and not all factors are applicable in every case. See <u>Allen v. Commissioner</u>, 72 T.C. 28, 34 (1979); sec. 1.183-2(b), Income Tax Regs.

In making our evaluation of the foregoing factors, we may consider evidence from years subsequent to the years in issue "to the extent it may create inferences regarding the existence of a profit motive in the earlier years." <u>Hillman v. Commissioner</u>, T.C. Memo. 1999-255 (citing <u>Hoyle v. Commissioner</u>, T.C. Memo. 1994-592). "[A]ctual profits or losses in those and subsequent years have probative, although not determinative, significance in such evaluation." <u>Smith v. Commissioner</u>, T.C. Memo. 1993-140.

Petitioner contends that he had a good faith objective to realize a profit from his mining activities during the years at issue and, therefore, his deductions with respect to his mining activities should not be limited by section 183. Respondent argues that an analysis of the relevant objective factors reveals that petitioner lacked a bona fide objective to make a profit.

B. <u>Applying the Factors</u>

    1. <u>The Manner in Which Petitioner Conducted the Activity</u>

In deciding whether a taxpayer has conducted an activity in a businesslike manner, we consider whether complete and accurate books and records were maintained, whether the activity was conducted in a manner substantially similar to other activities of the same nature that were profitable, and whether changes in

operating methods, adoption of new techniques, or abandonment of unprofitable methods were made in a manner consistent with an intent to improve profitability.  See Engdahl v. Commissioner, 72 T.C. 659, 666-667 (1979); sec. 1.183-2(b)(1), Income Tax Regs.

### a.   Petitioner's Record Keeping

While a taxpayer need not maintain a sophisticated cost accounting system, the taxpayer should keep records that enable the taxpayer to make informed business decisions.  See Burger v. Commissioner, 809 F.2d 355, 359 (7th Cir. 1987), affg. T.C. Memo. 1985-523.  For a taxpayer's books and records to indicate a profit motive, the books and records should enable a taxpayer to cut expenses, increase profits, and evaluate the overall performance of the operation.  See Abbene v. Commissioner, T.C. Memo. 1998-330.

The record in this case confirms that petitioner kept extensive records of his mining activities, including financial and tax records such as spreadsheets, bank statements, canceled checks, and invoices and operational records such as production records, test reports, consultant reports, correspondence, and related documents.  Petitioner produced these records both to the revenue agents who audited his tax returns for the years at issue and to an accountant, Steven Klovanish, whom petitioner hired to assist him in the audit.  Although petitioner and respondent disagree as to the organizational state of the records, Mr.

Klovanish testified that petitioner's records for the years at issue were in an "organized condition" and, with the exception of 1 year, corresponded with petitioner's tax returns.[21]

Although we are satisfied that petitioner kept books and records of his mining activities during the years at issue, we are not convinced that petitioner's record keeping represented anything other than an effort to maintain substantiation of the expenses claimed on his returns or that his record keeping was businesslike. As we have stated:

> The purpose of maintaining books and records is more than to memorialize for tax purposes the existence of the subject transactions; it is to facilitate a means of periodically determining profitability and analyzing expenses such that proper cost saving measures might be implemented in a timely and efficient manner. * * * [Burger v. Commissioner, T.C. Memo. 1985-523 (citing Golanty v. Commissioner, 72 T.C. at 430).]

See also Steele v. Commissioner, T.C. Memo. 1983-63 (checks served as adequate substantiation for claimed expenses but were not businesslike records).

In this case, petitioner has made no showing that he kept the kinds of books and records that would have enabled him to evaluate the financial condition of his mining activities. It

---

[21]Mr. Klovanish could not tie some of the numbers on petitioner's tax return for 1 year to petitioner's records but suggested that this might be due to the fact that he did not have information from petitioner's prior accountant to ascertain what adjustments the prior accountant had made in preparing the tax return.

appears from the record that petitioner did not maintain a general ledger or appropriate accounting journals, nor did he have financial statements, profit and loss projections, budgets, break-even analyses, marketing surveys, or other books and records of the type that would have permitted him to periodically monitor the financial condition of his mining operation. Moreover, petitioner has made no showing that he used the books and records that he did maintain for the purpose of "cutting expenses, increasing profits, and evaluating the overall performance of the operation." Golanty v. Commissioner, supra at 430; see also Sullivan v. Commissioner, T.C. Memo. 1998-367 (generally no profit motive where lack of evidence that taxpayer used records to improve losing venture), affd. without published opinion 202 F.3d 264 (5th Cir. 1999).

Petitioner did produce evidence that he submitted a mining plan of operations that was approved by the BLM on January 12, 1993. This plan of operations, however, was not a financial plan to monitor the profitability of petitioner's mining operation. Rather, the plan of operations was an operational plan required by law if a claimant wishes to disturb more than 2 acres of land per year on his claims. Thus, the plan of operations is not evidence that petitioner kept businesslike financial records.

Petitioner has failed to demonstrate that he maintained accurate and businesslike books and records with respect to his mining activities during the years at issue.

### b. Similarity to Other Activities of the Same Nature

Neither petitioner nor respondent offered any evidence as to the manner in which profitable mining businesses are conducted. See Wesinger v. Commissioner, T.C. Memo. 1999-372; Filios v. Commissioner, T.C. Memo. 1999-92, affd. 224 F.3d 16 (1st Cir. 2000); sec. 1.183-2(c), Example (4), Income Tax Regs. Thus, we are not in a position to evaluate whether petitioner's mining activity was conducted in a manner substantially similar to that of other profitable mining activities.

### c. Changes Made To Foster Profitability

There are numerous examples in the record demonstrating that petitioner made changes in operating methods, adopted new techniques, and/or abandoned unprofitable methods in the course of conducting his mining activities. See Engdahl v. Commissioner, supra at 666-667; sec. 1.183-2(b)(1), Income Tax Regs.

Petitioner continually increased the capacity of his mill site and mine (also known as the Roman mine) and periodically developed or improved the methods he used in his mining activity. For example, petitioner originally employed a leaching process of cyanidation for the recovery of precious metals. Petitioner was

not completely satisfied with the leaching process and changed methods to employ the gravity separation method.  In order to employ this new method, petitioner acquired a jaw crusher, a cone crusher, a ball mill circuit, a screw classifier, and a wier jig and table to concentrate material.  Petitioner also switched from using cyanide as a lixiviant in the concentration process to using bromine, after attending a Landall Mining Symposium in Reno, Nevada.  In early 1993, petitioner purchased a $50,000 induction furnace to improve recoveries through induction smelting.  Petitioner originally had a propane furnace, which was not powerful enough to melt platinum.  Lastly, L.R. Tinnell developed a proprietary fire assaying method for assaying refractory ores to augment the standard fire assaying method used in the industry.

Petitioner pursued several mining prospects but quickly abandoned those that he concluded had no potential to be profitable.  For example, in Mr. Cruson's January 15, 1993, geological report on the Tinnell Prospect, Mr. Cruson recommended that "No further work is justified on the claims covered by the Tinnell Prospect."  Pursuant to Mr. Cruson's recommendation, petitioner decided to cease work on the Tinnell Prospect.  In 1983 and 1984, petitioner pursued a gold mining venture in Lochiel, Arizona, but quickly abandoned that effort after realizing the operation would not be profitable.  Petitioner then

moved his equipment to Colorado and began another mining operation, which he also quickly terminated when he discovered he had been misled.

In 1996, following the loss of the Quartette Mine project, petitioner began to investigate the sale of decorative rock as an income source and opened a rock yard in Las Vegas. Petitioner took out an advertisement in the telephone directory yellow pages with respect to his decorative rock business. Petitioner's revenue from the sale of decorative rock in the 3 years prior to trial was significant, growing steadily from year to year; i.e., $32,364 in 1997, $126,170 in 1998, and $373,566 in 1999.

Petitioner continually searched for operating methods and business ventures to reduce his losses, generate revenue, and improve profitability. Ultimately, petitioner was successful in generating substantial revenue from the sale of decorative rock. Thus, we are convinced that the changes petitioner implemented before, during, and after the years at issue have the potential to affect the long-range profitability of petitioner's mining activity materially and favorably. See Golanty v. Commissioner, 72 T.C. at 428 (changes must be sufficient to change materially the prospect of profitability).

### d. Summary

Petitioner's changes in operating methods, adoption of new techniques, and abandonment of unprofitable methods to improve

profitability are counterbalanced by petitioner's failure to demonstrate that he maintained accurate and businesslike books and records and to introduce evidence regarding the operation of successful mining ventures. See Engdahl v. Commissioner, 72 T.C. at 666-667; sec. 1.183-2(b)(1), Income Tax Regs. We, therefore, must conclude that this factor is neutral.

2. The Expertise of Petitioner or His Advisers

Preparation for an activity by extensive study of its accepted business, economic, and scientific practices or consultation with industry experts may indicate a profit motive where the taxpayer carries on the activity in accordance with such practices. See sec. 1.183-2(b)(2), Income Tax Regs.

Petitioner demonstrated that he had a thorough understanding of the scientific and economic aspects of mining and that he regularly consulted with industry experts. In 1978, petitioner began reading prospecting books and became interested in mining. Petitioner attended shows and seminars about mining and purchased numerous books on geology and mining. Petitioner also learned how to read geological mining maps. Petitioner learned about mining both from self-teaching methods and experience over the years. Petitioner also did consulting work in or about 1988 with Kent Kjelberg at the Rattlesnake Mine and provided his expertise and equipment to help develop the mine.

Petitioner hired advisers, including geologists and accountants, and sought advice from Government officials regularly.  See Jorgenson v. Commissioner, T.C. Memo. 2000-38. For example, petitioner used Mr. Cruson on at least two occasions to advise him on the Tinnell Prospect and the Quartette Mine.  In 1999, petitioner hired a geologist to prepare a report detailing the occurrence of uncommon variety materials on petitioner's claims in the Newberry Mountains in southern Nevada.

Petitioner also employed one of his sons at the mine.  The evidence demonstrates that L.R. Tinnell has a thorough understanding of both the technical and business aspects of mining.  L.R. Tinnell graduated from the University of Nevada, Las Vegas, and also took a graduate-level course in economic geology.  L.R. Tinnell was responsible for dealing with Government agencies, such as the U.S. Fish and Wildlife Service, the Nevada Department of Environmental Protection, and the Mine Safety and Health Administration, on behalf of petitioner.  L.R. Tinnell was also in charge of underground mining and tests, negotiations with Government agencies, and coordinating assays.

This factor favors petitioner.

### 3. Petitioner's Time and Effort Devoted to the Activity

The fact that a taxpayer devotes personal time and effort to carry on an activity may indicate an intention to derive a profit, particularly where there are no substantial personal or

recreational elements associated with the activity.  See Daley v. Commissioner, T.C. Memo. 1996-259; sec. 1.183-2(b)(3), Income Tax Regs.  A taxpayer's withdrawal from another occupation to devote most of his energies to the activity may be evidence that the activity was engaged in for profit.  See sec. 1.183-2(b)(3), Income Tax Regs.

Respondent does not dispute that petitioner devoted a substantial amount of time and effort to his mining activities. In or about 1988, petitioner began to disengage from his pharmaceutical and medical activities and to spend more time in his mining activity.  Petitioner estimated he spent about 90 percent of his time on mining and only 10 percent of his time working in his medical practice during the years at issue. Petitioner's estimate is corroborated by the small amount of revenue petitioner derived from his medical practice in the 10 years prior to trial.  Further, the record demonstrates that petitioner spent an enormous amount of his time, personal finances, and energy over the past 20 years on his mining activities.

This factor favors petitioner's position.

### 4.  The Expectation That Assets Used in the Activity Would Appreciate in Value

The term "profit" encompasses revenue from operations and appreciation in the value of assets, such as land.  Sec. 1.183-2(b)(4), Income Tax Regs.

Thus, the taxpayer may intend to derive a profit from the operation of the activity, and may also intend that, even if no profit from current operations is derived, an overall profit will result when appreciation in the value of land used in the activity is realized since income from the activity together with the appreciation of land will exceed expenses of operation. * * * [Id.]

Petitioner presented insufficient evidence to enable us to evaluate this factor adequately. Consequently, we do not consider this factor in our analysis.

5. Petitioner's Success in Other Entrepreneurial Activities

That a taxpayer has engaged in similar activities in the past and converted them from unprofitable to profitable enterprises may indicate that the taxpayer is engaged in the present activity for a profit, even though the activity is presently unprofitable. See sec. 1.183-2(b)(5), Income Tax Regs.

The record demonstrates that petitioner had at least two successful entrepreneurial ventures before commencing his mining activities. First, in or about 1973, petitioner and his father purchased Delta Roofing Mills, a roofing manufacturing business in Slidell, Louisiana, for approximately $1 million. Within 5 years, petitioner and his father tripled the company's gross sales and sold it to Republic Gypsum Corp. for approximately $3 million.

Second, during the late 1970's, petitioner invented the cream. In September 1980, petitioner and his partner formed Zila

Pharmaceuticals, Inc., which later became a wholly owned subsidiary of Zila.  At the time of trial, Zila had over 200 employees and a market capitalization of approximately $200 million.  The cream, which is now called Zylactin, is still on the market as an over-the-counter treatment for herpes, and petitioner has received substantial royalties from his invention.

The record demonstrates that petitioner has realized profits from other successful business ventures.  This factor favors petitioner's position.

### 6. Petitioner's History of Income or Loss From the Activity

A taxpayer's history of income or loss with respect to any activity may indicate the presence or absence of a profit objective.  See Golanty v. Commissioner, 72 T.C. at 426; sec. 1.183-2(b)(6), Income Tax Regs.  The magnitude of the activity's losses in comparison with its revenues is an indication that the taxpayer did not have a profit motive.  See Dodge v. Commissioner, T.C. Memo. 1998-89 (citing Burger v. Commissioner, 809 F.2d at 360), affd. without published opinion 188 F.3d 507 (6th Cir. 1999).  "[A] series of startup losses or losses sustained because of unforeseen circumstances beyond the control of the taxpayer may not indicate a lack of profit motive."  Kahla v. Commissioner, T.C. Memo. 2000-127 (citing Engdahl v. Commissioner, 72 T.C. at 669; sec. 1.183-2(b)(6), Income Tax Regs.).

In this case, petitioner's losses in comparison with his revenues are substantial. From 1980 through 1991, petitioner did not report any income from his mining activities, and from 1989 through 1991, petitioner reported $723,656 in net losses. From 1992 through 1999, petitioner reported a total of $537,800 in revenue and $3,347,724 in losses.

This factor favors respondent's position.

### 7. The Amount of Occasional Profits Generated by the Activity

The amount of profits earned in relation to the amount of losses incurred, the amount of the investment, and the value of the assets in use may indicate a profit objective. See sec. 1.183-2(b)(7), Income Tax Regs. Profit means economic profit, independent of tax savings. See Drobny v. Commissioner, 86 T.C. 1326, 1341 (1986); Seaman v. Commissioner, 84 T.C. 564, 588 (1985).

Petitioner conceded on brief that he did not realize any economic profit until 1999 and only began generating "meaningful revenue" in 1997.[22] Petitioner contends, however, that section 1.183-2(b)(7), Income Tax Regs., best describes his mining

---

[22]During the years at issue in this case, petitioner reported over $1.6 million in costs and expenses related to his mining activities and only $2,800 of revenue. In the subsequent 5 years, however, petitioner reported $535,000 in revenue and approximately $2.2 million in costs and expenses. In 1999, petitioner's revenue of $373,566 surpassed his operating costs and expenses of $322,328, exclusive of depreciation.

activity:  "[A]n opportunity to earn a substantial ultimate profit in a highly speculative venture is ordinarily sufficient to indicate that the activity is engaged in for profit even though losses or only occasional small profits are actually generated."  Respondent's argument on brief with respect to this factor consisted solely of the following sentence:  "The petitioner has never reflected a profit from his mining activity, and his losses have been substantial."

A mining venture is speculative and may take years to realize a profit.  A mining venture nevertheless may present an opportunity to earn substantial profits, particularly if the mining claims involved have "high mineral potential" as at least some of petitioner's claims apparently did.  Petitioner presented the testimony of an expert geologist who confirmed that petitioner's efforts with respect to the Quartette Mine were worth pursuing and that some of petitioner's claims merited development.  While speculative, petitioner's mining activity offered the potential to generate significant income, and that possibility may be sufficient to indicate that petitioner engaged in the activity for profit even though only losses were produced. See sec. 1.183-2(b)(7), Income Tax Regs.

Petitioner believed he could and would earn a profit from his many activities.  The objective facts also support petitioner's contention that a profit was attainable.  In 6 of

the 8 years prior to trial, petitioner earned revenue on sales of decorative rock in increasing amounts.  Petitioner testified that he continued to generate revenue from sales of decorative rock in 2000 and that his gross revenue during the first 2 months of 2000 was approximately $55,000, an increase of 200 percent compared to revenue earned in the first 2 months of 1999.  Referencing the "Resource Management Plan" map prepared by and for the BLM that acknowledged the "high mineral potential" on and around petitioner's mining claims, petitioner testified that there is "absolutely" gold and silver on his claims and that he intends to "go back to the gold when the price turns".

The possibility of a speculative profit becomes less speculative when a taxpayer shows he actually realized a profit in years subsequent to those at issue.  See Hillman v. Commissioner, T.C. Memo. 1999-255; Hoyle v. Commissioner, T.C. Memo. 1994-592; Smith v. Commissioner, T.C. Memo. 1993-140 (actual profits or losses in subsequent years have probative, although not determinative, significance).  Here, petitioner's efforts to generate revenue from the production and sale of decorative rock are succeeding, as revenue has increased steadily each year, and in 1999 petitioner's mining activities generated a profit before depreciation.  This factor favors petitioner's position.

### 8. Petitioner's Financial Status

That the taxpayer does not have substantial income or capital from sources other than the activity in question may indicate that the activity is engaged in for profit. See sec. 1.183-2(b)(8), Income Tax Regs. Substantial income from sources other than the activity (especially if the losses from the activity generate substantial tax benefits) may indicate a lack of profit motive, particularly where there are elements of personal pleasure or recreation involved. See id.

Respondent argues that little financial pressure or incentive existed to pursue work that was consistently profitable because petitioner could fund his mining activities with the royalties he received from Zila and with the proceeds from the sale of Zila stock.[23] Petitioner contends that the tax benefits he realized were relatively small in comparison to the out-of-pocket expenditures he made and that his financial commitment to his mining activity confirms his intention to make a profit from the activity.

Petitioner's income from Zila royalties and stock was substantial during the years at issue; however, petitioner invested a substantial portion of that money each year in his mining activities. Petitioner financed his mining activity with

---

[23]With respect to his medical practice, however, petitioner did not earn more than $36,723 in any year from 1989 through 1998, and he sustained losses in 3 of those years.

Zila royalties and from the sale of Zila stock.  Petitioner sold his Zila stock as he needed money and borrowed money that was secured by his Zila stock.

By the time of trial, petitioner had sold most of his Zila stock and had used the proceeds from the sale of the stock and all of his Zila royalties for many years to fund his mining activity.  Petitioner's financial commitment to his mining activity apparently led respondent to concede in his reply brief that it "is probably true" petitioner's mining expenditures were not motivated by tax savings.

This factor favors petitioner's position.

### 9.  Elements of Personal Pleasure or Recreation

The existence of personal pleasure or recreation relating to the activity may indicate the absence of a profit objective.  See sec. 1.183-2(b)(9), Income Tax Regs.

Petitioner argues that mining is not the sort of activity a person engages in for personal pleasure and that the frustrations in dealing with Federal, State, and local government regulatory agencies and the harsh working conditions offset any elements of personal pleasure derived from mining.  Respondent contends that personal enjoyment can coexist with demanding labor and that petitioner loves being at the mine and is tired of working with sick people.

The record confirms that mining is an extremely laborious activity that requires substantial time, energy, and financial support.  Mining also entails numerous health risks, including heat prostration in the summer months, silicosis, and cyanide poisoning.  Despite these risks and hardships, there is evidence suggesting that petitioner derives some personal pleasure from his mining activities.  During the audit and at trial, petitioner acknowledged that he enjoyed being outdoors, and that he was "tired of dealing with sick people".

On balance, we are convinced that the small element of personal pleasure that petitioner derived from being outdoors and from his reduced involvement in his medical practice did not outweigh the hardships and danger involved in the mining activity or the substantial depletion of petitioner's royalty income and Zila stock.  Moreover, some component of personal pleasure does not negate a bona fide profit motive.  "[A] business will not be turned into a hobby merely because the owner finds it pleasurable; suffering has never been made a prerequisite to deductibility.  'Success in business is largely obtained by pleasurable interest therein.'"  Jackson v. Commissioner, 59 T.C. 312, 317 (1972) (quoting Wilson v. Eisner, 282 F. 38, 42 (2d Cir. 1922)); see also sec. 1.183-2(b)(9), Income Tax Regs.

This factor favors petitioner's position.

C. <u>Conclusion</u>

After considering the factors listed in section 1.183-2(b), Income Tax Regs., all contentions presented by the parties, and the unique facts and circumstances of this case, we conclude that petitioner entered into the activity of mining with a dominant hope and intent of realizing a profit.  See <u>Wolf v. Commissioner</u>, 4 F.3d at 713; <u>Vorsheck v. Commissioner</u>, 933 F.2d at 758; <u>Machado v. Commissioner</u>, T.C. Memo. 1995-526; <u>Warden v. Commissioner</u>, T.C. Memo. 1995-176.  We hold that petitioner's mining activity during the years in issue was an activity engaged in for profit within the meaning of section 183.

II.  <u>Section 6662(a) Penalty</u>

In his notices of deficiency, respondent determined that petitioner was liable for an accuracy-related penalty due to negligence or disregard of rules or regulations for each of the years in issue.  Section 6662 authorizes respondent to impose an accuracy-related penalty equal to 20 percent on the portion of an underpayment attributable to, among other things, negligence or disregard of rules or regulations.  See sec. 6662(a), (b)(1), and (c).  "Negligence" includes any failure to make a reasonable attempt to comply with the provisions of the internal revenue laws, to exercise ordinary and reasonable care in the preparation of a tax return, to keep adequate books and records, or to substantiate items properly.  Sec. 6662(c); <u>Allen v.</u>

Commissioner, 925 F.2d 348, 353 (9th Cir. 1991), affg. 92 T.C. 1 (1989); Bunney v. Commissioner, 114 T.C. 259, 266 (2000); sec. 1.6662-3(b)(1), Income Tax Regs.  The term "disregard" includes any careless, reckless, or intentional disregard.  Sec. 6662(c); sec. 1.6662-3(b)(2), Income Tax Regs.

The penalty imposed by section 6662(a) and (b)(1) will not apply if a taxpayer shows there was reasonable cause for any portion of an underpayment and the taxpayer acted in good faith with respect to that portion.  See sec. 6664(c)(1); sec. 1.6664-4(a), Income Tax Regs.  The determination of whether a taxpayer acted in good faith is made on a case-by-case basis, taking into account all the pertinent facts and circumstances.  See Compaq Computer Corp. v. Commissioner, 113 T.C. 214, 226 (1999); sec. 1.6664-4(b)(1), Income Tax Regs.

Petitioner bears the burden of proving that respondent's determination is erroneous.  See Rule 142(a); Allen v. Commissioner, 925 F.2d at 353; Axelrod v. Commissioner, 56 T.C. 248, 258 (1971).

A.  Stipulated and Computational Issues

Respondent proposed several adjustments with respect to petitioner's returns for the years in issue.  Some of the adjustments were settled before trial, as reflected in the stipulations of settled issues, or are computational.  See supra note 2.  Petitioner introduced evidence at trial, and argued on

brief, in support of his position that the accuracy-related penalty should not be imposed with respect to the mining deductions or the exercise of Zila stock options. Petitioner, however, did not present any evidence concerning the accuracy-related penalty as it relates to the remaining settled or computational issues. Consequently, we hold that petitioner has failed to prove that the accuracy-related penalty should not apply with respect to the remaining settled and computational issues. See Rule 149(b). We sustain respondent's determination as to the settled and computational issues, excluding only the adjustment with respect to petitioner's exercise of his Zila stock options discussed separately below.

B. Exercise of Zila Stock Options

In 1993, petitioner was required to report ordinary income of $548,271 from his exercise of stock options to purchase 380,000 shares of Zila, after taking into account an exercise price of $285,000 and Zila's per-share blockage discount of $282,979. On petitioner's 1993 Federal income tax return, however, he reduced the amount of ordinary income derived from his exercise of his Zila stock options (and shown on a Form 1099 issued to him) by an additional $282,979, claiming that he was entitled to an additional discount because the sale of the shares was restricted. Petitioner disclosed this additional discount on a schedule that fully described the total options exercised, the

exercise amount, the fair market value, the exercise price, the per-share blockage discount applied by Zila, the amount of ordinary income reported on Form 1099, and the additional discount for restrictions on stock taken by petitioner (marketability discount). The schedule contained the following statement concerning the marketability discount:

> THIS DISCOUNT TAKEN BECAUSE TAXPAYER FEELS THAT STOCK WOULD BE SEVERELY EFFECTED IF HE PUT ALL THESE SHARES ON MARKET IN ONE BLOCK. IN ADDITION TAXPAYER CANNOT SELL SHARES FOR THESE YEARS PER SEC REGULATIONS. THEREFORE, PRESENT VALUE IS LESS.

In the second Stipulation of Settled Issues filed with the Court, petitioner and respondent agreed that petitioner is entitled to only one discount of $282,979 and that, in 1993, petitioner understated ordinary income from the exercise of Zila stock options by $282,979.

The applicable regulations regarding the accuracy-related penalty as to negligence, which became effective for returns due after December 31, 1991, and applied to returns filed for 1993, contained an adequate disclosure exception. See sec. 1.6662-2(d), Income Tax Regs. These regulations provided that no penalty under section 6662(a) and (b)(1) will be imposed where a taxpayer has made an adequate disclosure of a nonfrivolous position in accordance with the provisions of section 1.6662-4(f)(1), (3), (4), and (5), Income Tax Regs. See secs. 1.6662-1, 1.6662-3(c)(1) and (2), Income Tax Regs. Under the regulations,

disclosure was adequate with respect to an item or a position on a return only if it was made on Form 8275 or Form 8275-R attached to the return or to a qualified amended return for the taxable year. See Kelly v. Commissioner, T.C. Memo. 1996-529; sec. 1.6662-4(f)(1), Income Tax Regs.[24]

The disclosure petitioner made on his 1993 return did not satisfy the regulations' definition of an adequate disclosure and, thus, is insufficient to avoid the accuracy-related penalty under section 6662(a) and (b)(1). The regulations explicitly state that an adequate disclosure statement for purposes of the accuracy-related penalty as to negligence must be made on Form 8275 or Form 8275-R. See Kelly v. Commissioner, supra; sec. 1.6662-4(f)(1), Income Tax Regs. Petitioner did not attach a Form 8275 or Form 8275-R to his 1993 return and, therefore,

---

[24]For returns due before Dec. 31, 1991, taxpayers were entitled to rely on Notice 90-20, 1990-1 C.B. 328, which states that "disclosure must be full and substantive and be clearly identified as being made to avoid imposition of the accuracy-related penalty." See also Kelly v. Commissioner, T.C. Memo. 1996-529. Notice 90-20, supra, also provided that "The disclosure must be made on the return or on a properly completed Form 8275, Disclosure Statement Under Section 6661, attached to the return." Sec. 1.6662-4(f)(1), Income Tax Regs., in effect for 1993, sets forth stricter requirements than those set forth in Notice 90-20, supra, in order to avoid the imposition of the accuracy-related penalty under sec. 6662(a) and (b)(1).

In addition, the provisions of sec. 1.6662-4(f)(2), Income Tax Regs., which permit disclosure in accordance with an annual revenue procedure for purposes of the substantial understatement penalty, do not apply for purposes of the accuracy-related penalty imposed for negligence. See sec. 1.6662-3(c)(2), Income Tax Regs.

failed to meet the strict requirements of sections 1.6662-3(c)(1) and (2) and 1.6662-4(f)(1), Income Tax Regs.

Even though petitioner did not make an adequate disclosure sufficient to avoid the penalty under the applicable regulations, petitioner may still be relieved of liability for the accuracy-related penalty if he shows there was reasonable cause for the understatement and he acted in good faith with respect to the understatement.  See sec. 6664(c); sec. 1.6664-4(a), Income Tax Regs.  We decide whether petitioner acted with reasonable cause and in good faith after reviewing all the facts and circumstances and taking into account a variety of factors.  See sec. 1.6664-4(b), Income Tax Regs.  The most important factor is the extent of petitioner's effort to assess his proper tax liability.  See sec. 1.6664-4(b)(1), Income Tax Regs.

Petitioner contends that he claimed the additional marketability discount after consultation with his accountant and that, at all times, he "reasonably relied upon the expertise and advice of a certified public accountant in the preparation and filing of" his tax return.[25]  The only evidence petitioner

_____

[25]Petitioner also argued that any understatement attributable to an undervaluation of the Zila stock should be reduced if (i) the tax treatment is supported by substantial authority, or (ii) there was adequate disclosure of relevant facts on his return.  See sec. 6662(d)(2)(B).  By its terms, and as indicated by the regulations, the exception in sec. 6662(d)(2)(B) applies only to an accuracy-related penalty imposed on an underpayment attributable to any substantial understatement
(continued...)

presented to indicate that he "reasonably relied upon the expertise and advice" of his accountant, however, was his own self-serving testimony, which we are not required to accept. See Tokarski v. Commissioner, 87 T.C. 74, 76 (1986). Petitioner's 1993 return does not indicate that the marketability discount was taken on the advice of his accountant or that petitioner consulted his accountant. Further, there is no evidence that petitioner retained an expert to value the stock before claiming the marketability discount. To the contrary, the schedules indicate that the additional discount was taken because petitioner felt that the stock was restricted and that an additional discount was warranted.[26]

We find that petitioner has failed to prove that there was reasonable cause for the understatement and that he acted in good faith in applying an additional discount to reduce the value of the Zila stock acquired by exercising his stock options. We hold, therefore, that petitioner is liable for an accuracy-related penalty with respect to the additional income generated by the exercise of his Zila stock options.

---

[25](...continued)
of income tax. See sec. 6662(b)(2), (d)(2)(B); sec. 1.6662-4(a), Income Tax Regs.

[26]Petitioner's reporting position regarding the additional discount was inconsistent with the Form 1099 furnished by Zila, which allowed a blockage discount of only $282,979.

III. <u>Conclusion</u>

We have considered the remaining arguments of both parties for results contrary to those expressed herein and, to the extent not discussed above, find those arguments to be irrelevant, moot, or without merit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155.</u>